UNITED STATES of America,

v.

Liborio BELLOMO, et al., Defendants.

Nos. 96 CR 430(LAK),
S1 96 CR 430(LAK).

United States District Court,
S.D. New York.

Jan. 17, 1997.

634

Nelson Boxer, Maria Barton, Assistant United States Attorneys, Mary Jo White, United States Attorney, Jack Litman, Litman, Asche, Gioella & Bassin, Michael Ross, LaRossa, Mitchel & Ross, New York City, for Defendant Liborio Bellomo.

David Breitbart, Alan S. Futerfas, New York City, for Defendant Michael Generoso.

Jeffrey Hoffman, Hoffman & Pollack, New York City, for Defendant James Ida.

Alan Polak, New York City, for Defendant Nicholas Frustaci.

Mark Herman, Herman & Beinin, New York City, for Defendant John Schenone.

Joel Winograd, Winograd & Winograd, New York City, for Defendant Anthony Pisapia.

Lisa Scolari, New York City, for Defendant Thomas Barrett.

Gerald LaBush, New York City, for Defendant James Pisacano.

Paul Brenner, for Defendant Joseph Pisacano.

Diarmuid White, New York City, for Defendant Vincent Romano.

Phyllis Mingione, New York City, for Defendant Colombo Saggese.

Michael Washor, New York City, for Defendant Louis Zacchia.

Kenneth Wirfel, New York City, for Defendant Leonard Cerami.

Ralph Fresolone, Hauppauge, NY, for Defendant Michael Autuori.

Howard Jacobs, for Defendant Louis Ruggiero, Sr.

Harold Borg, Kew Gardens, NY, for Defendant Albert Setford.

David Wikstrom, for Defendant Vincent Batista.

## OPINION

KAPLAN, District Judge.

The original indictment in this case contains sixty counts against a total of 19 defendants. The superseding indictment charges ten of those defendants with much the same offenses. This opinion disposes of the defendants' pretrial motions with respect to both indictments to the extent those motions were not resolved previously.[1] The matters remaining for decision include motions to (1) suppress wiretap evidence from a cellular telephone; (2) dismiss a racketeering act on the ground that it does not state an offense; (3) dismiss a racketeering act on double jeopardy or collateral estoppel grounds; (4) sever the trials of various defendants; (5) dismiss the forfeiture allegations in the indictment as to certain defendants; and (6) vacate the pretrial restraint of certain defendants' substitute assets.

### Facts

The core of the indictments are charges under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"). The enterprise is the alleged Genovese organized crime family, said to be one of the five "families" that reportedly dominate organized crime in the New York area. Twelve of the defendants,[2] including all ten named on the superseding indictment, are said to be members or associates of the family. They are charged in counts one and two with conspiring to conduct and conducting the affairs of the enterprise through a pattern of racketeering activity including murder, conspiracy to murder, solicitation to

---

1. In view of the similarity between the original and the superseding indictments with respect to the ten defendants common to both, the parties agreed that the pretrial motions of those defendants with respect to the original indictment would be deemed applicable to the superseding indictment. (Tr., Dec. 9, 1996, at 63) The common defendants were afforded an additional opportunity to make pretrial motions with respect to new issues raised by the superseding indictment. Only defendant Louis Zacchia did so.

2. Liborio Bellomo, Michael Generoso, James Ida, Nicholas Frustaci, Thomas Cestaro, Thomas Barrett, John Schenone, Anthony Pisapia, Louis Zacchia, Anthony Coiro, Michael Autuori and Leonard Cerami.

murder, extortion, attempted labor racketeering, operation of illegal bookmaking and gambling businesses, loansharking, money laundering, mail and wire fraud, obstruction of justice, and interstate transportation of stolen property. 18 U.S.C. §§ 1962(c), 1962(d). Other counts of the indictments charge these defendants with a wide variety of substantive offenses, all or most of which are alleged as RICO predicate acts in the first two.

The seven other defendants are not charged with violation of RICO. Louis Ruggiero, Sr. is charged in counts nine and ten with murder and conspiracy to murder, although the murder and murder conspiracy are charged as RICO predicate acts against certain other defendants. In counts sixteen through twenty-one, Albert Setford, Colombo Saggese, Joseph Pisacano, James Pisacano, Vincent Batista, and Vincent Romano, in addition to a number of the RICO defendants, are charged with conducting illegal bookmaking businesses and/or transmitting wagering information via wire.

### Discussion

*Defendants' Motions to Suppress Communications Intercepted Over Ida's Cellular Phone*

In an order dated November 3, 1994, Honorable Milton Pollack authorized, for thirty days, the interception of communications on a cellular phone registered to a company named IPPI and used by James Ida. Judge Pollack subsequently renewed this order for another thirty days on December 7, 1994. James Ida, Liborio Bellomo and Michael Generoso move to suppress the conversations intercepted under these orders on a variety of grounds.

#### Ida's Motion

*Alleged Lack of Probable Cause—Initial Application*

Ida seeks to suppress first on the ground that there was no probable cause for the issuance of the initial order.

As an initial matter, the Court notes that Judge Pollack's determination that probable cause existed for the interceptions is entitled to substantial deference. *See United States*

*v. Wagner,* 989 F.2d 69, 72 (2d Cir.1993) ("[a] reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists."). Therefore, if this Court determines that Judge Pollack had a substantial basis for his finding of probable cause, Ida's argument must be rejected. Furthermore, any doubt about the existence of probable cause will be resolved against the challenge to Judge Pollack's determination. *See Illinois v. Gates,* 462 U.S. 213, 237 n. 10, 103 S.Ct. 2317, 2331 n. 10, 76 L.Ed.2d 527 (1983).

Probable cause is not an especially demanding standard in this context. " '[O]nly the probability, and not the prima facie showing, of criminal activity is the standard of probable cause.' " *Id.* at 235, 103 S.Ct. at 2330 (quoting *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590–91, 21 L.Ed.2d 637 (1969)). In assessing the proof presented by the government on the issue of probable cause, the court must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [it], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* In other words, the government's affidavit in support of probable cause "must be read as a whole, and construed in a realistic and common sense manner, so that its purpose is not frustrated." *United States v. Ruggiero,* 824 F.Supp. 379, 398 (S.D.N.Y.1993), *aff'd,* 44 F.3d 1102 (2d Cir.1995) (citing *United States v. Harris,* 403 U.S. 573, 577–79, 91 S.Ct. 2075, 2078–80, 29 L.Ed.2d 723 (1971)).

Ida attempts to pick apart the government's presentation to Judge Pollack. However, his argument ignores the admonition of cases like *Ruggiero* and *Gates* that a court must look at the government's support for probable cause as a whole. The affidavit taken as a whole clearly provided an ample basis for Judge Pollack's finding.

The government's initial application to Judge Pollack was based upon a detailed affidavit of FBI Agent Campi. The proof of probable cause was substantial. Reliable in-

formants stated that Ida was a high ranking member, the "consigliere," of the Genovese crime family. These sources, two of whom were identified by name and their previous reliability detailed, told the FBI that Ida held regular Monday night meetings to discuss illegal activities. The informants stated also that Ida held conversations while taking walks out-of-doors (so called "walk-and-talks") so that his conversations could not easily be recorded. Observation by law enforcement agents confirmed the existence of the walk-and-talks. Moreover, some law enforcement agents related having overheard portions of conversations during walk-and-talks that seemed criminal in nature.

The government's affidavit established that Ida was using the cellular phone to contact members and associates of the Genovese crime family. Although the phone was registered in the name of IPPI, toll records and pen registers showed that the majority of calls from the phone were to organized crime figures, none of whom was associated with IPPI, and to Ida's family, not to commercial establishments. Furthermore, an intercepted conversation from another source showed that Ida was using the cellular phone to set up the Monday meetings of his criminal crew.

The affidavit demonstrated substantial basis for belief that this crew was involved in numerous criminal activities including illegal gambling, loansharking, and robbery. Electronic surveillance had revealed conversations dealing with the cellular telephone targets concerning these illegal activities, and sources informed that the crew was engaged in such activity. This evidence, taken as a whole, constituted a strong showing that Ida had used, and would continue to use, the cellular phone to discuss the various criminal activities specified in the government's application.

In addition, the affidavit adduced evidence suggesting that Ida used the phone to communicate about alleged money laundering. It gave reason to believe that Ida had income beyond his means and that he apparently used other persons' names to hide his assets. Specific incidents of Ida's apparent use of others' names in purchasing expensive items were shown, some involving James Hickey, a

principal in IPPI. Furthermore, information possibly linking Hickey to previous Genovese money laundering schemes was presented. While Ida argues that IPPI was a legitimate business, the FBI's showing of Ida's suspiciously large net worth and his penchant for making large purchases in other people's names, coupled with Hickey's alleged complicity in hiding assets for Ida as well as others, established probable cause to believe that money laundering would be discussed over the cellular phone.

*Alleged Lack of Probable Cause—First Renewal*

■ Ida challenges also the first renewal order authorizing the continued interception of conversations over the cellular phone. He takes issue with the evidence that the government produced to support the renewal, claiming that it all had an innocent explanation. The government counters that although the conversations, if taken alone, might be explained away, they demonstrated probable cause when looked at in context and with the aid of an expert's interpretation of their meaning.

In addition to incorporating all of the information contained in the initial application, the affidavit executed by Agent Campi in support of the renewal referenced a number of intercepted conversations that were said to illustrate Ida's participation in the affairs of the crime family and his position of control over many of its members. Conversations in which Ida told certain crime family members to attend specific meetings suggested that Ida ran the Monday night meetings and that criminal activity was discussed in them. In addition, there were a number of intercepted communications which showed that certain Genovese family members reported to Ida intermittently.

Other, coded conversations were said to show Ida communicating with Bellomo to set up meetings in undisclosed places to discuss, among other things, the alleged head of the Genovese crime family, Vincent "The Chin" Gigante. Several recorded conversations showed Ida discussing business affairs with Hickey in a way that suggested that the two were working out the details of money laundering operations. Finally, a number of con-

versations were said to show Ida discussing possible labor racketeering activities with an unidentified male.

While the intercepted conversations, considered separately, may not be dispositive of guilt on the particular issues, that is not the relevant standard. The evidence presented in support of the renewal application was sufficient to support Judge Pollack's finding of probable cause as to the cellular phone and the allegedly criminal conversations sought to be intercepted, and so Ida's motion is denied.[3]

### Good Faith Exception

■ Even if probable cause was lacking, the intercepted communications still would escape suppression. Under *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), evidence gathered pursuant to a warrant which later is found not to have been based on probable cause need not be suppressed if the officers enforcing the warrant relied in good faith on its validity. Although *Leon* does not directly address electronic surveillance, numerous courts have extended its holding to such evidence. *See United States v. Moore*, 41 F.3d 370, 376 (8th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1985, 131 L.Ed.2d 872 (1995); *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir.1988), *cert. denied*, 489 U.S. 1024, 109 S.Ct. 1149, 103 L.Ed.2d 209 (1989); *United States v. Ambrosio*, 898 F.Supp. 177, 187 (S.D.N.Y.1995); *United States v. Milan–Colon*, 1992 WL 236218, at *22, *24 (S.D.N.Y. 1992); *United States v. Gambino*, 741 F.Supp. 412, 414–15 (S.D.N.Y.1990); *but see United States v. McGuinness*, 764 F.Supp. 888, 897 n. 2 (S.D.N.Y.1991). This Court sees no principled basis for distinguishing electronic surveillance from other searches and seizures in this respect and therefore agrees that *Leon* applies in these circumstances.

■ Under *Leon*, evidence obtained pursuant to a warrant which later is found to have been issued without probable cause will be suppressed only if: (1) the issuing judge abandoned his detached, neutral role; (2) the agent was dishonest or reckless in preparing the supporting affidavit for the wiretap order; or (3) the agents' reliance on the warrant was not reasonable. *See Leon*, 468 U.S. at 922–25, 104 S.Ct. at 3420–22.

Ida does not rely on the first *Leon* prong. Rather, he maintains that since probable cause for the warrants so obviously was lacking, the government was reckless in preparing affidavits which maintained that there was probable cause. He makes no allegation that the government included false facts in the affidavit either intentionally or recklessly.

The government's reliance on an order based on the extensive and persuasive showing of probable cause laid out in Agent Campi's affidavits and accepted by Judge Pollack can not be characterized as unreasonable, even if a court later were to determine that probable cause was lacking. Ida has not demonstrated any lack of good faith on the part of the government. This Court therefore finds that even if probable cause was lacking in the initial and renewal applications presented to Judge Pollack, the good faith exception in *Leon* would compel this Court to deny suppression of the evidence.

### Alternative Means of Investigation

■ Ida claims also that the government failed to demonstrate the inadequacy of alternative investigative means for obtaining the information sought through the wiretap and that its application therefore was insufficient.

■ As a predicate to approving a wiretap application, a judge must determine that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed or to be too dangerous." 18 U.S.C. § 2518(3)(c). This is far from an insurmountable hurdle. The government must demonstrate only that normal investigative techniques would prove difficult.

---

3. This conclusion is not disturbed because many of the conversations were in vague and coded language. A court is justified in relying on an expert's opinion as to evidence in a wiretap application, and Agent Campi provided credible interpretations of the content of these conversations. It would defeat the purpose of the wiretap statute to allow criminals to avoid detection simply by using nicknames and code to disguise their activities.

It need not show that any other option would be doomed to failure. As the Second Circuit has explained:

> "the purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather, they only require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *United States v. Torres,* 901 F.2d 205, 231 (2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990).

"A reasoned explanation, grounded in the facts of the case, and which 'squares with common sense, is all that is required.'" *United States v. Ianniello,* 621 F.Supp. 1455, 1465 (S.D.N.Y.), *aff'd* 808 F.2d 184 (2d Cir. 1985) (quoting *United States v. Shipp,* 578 F.Supp. 980, 989 (S.D.N.Y.1984) (Weinfeld, J.), *aff'd sub nom. United States v. Wilkinson,* 754 F.2d 1427 (2d Cir.), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985)). Additionally, like the issuing judge's determination of probable cause, a determination that the government has made this showing is entitled to substantial deference from a reviewing court. *See id.*

Ida claims that the government's affidavits failed to make this showing because the government had alternative methods with which to observe the Monday night meetings. He contends that the government's claims that it had used all available means of investigation were mere boilerplate that was not sufficient to satisfy the requirements of the statute.

Ida's argument incorrectly assumes that observation of the meetings was the purpose of the wiretap. The wiretap, however, was sought and authorized in order to allow law enforcement officers to intercept conversations regarding certain criminal activity that it believed would take place over Ida's cellular phone. A probable cause showing was made to justify such interceptions. The alternative methods that Ida proposes for surveilling the Monday night meetings would not have aided the government's attempts to hear telephone conversations discussing illegal conduct. The wiretap application was necessary so that this investigative aim could be achieved, and no other technique would have served the same purpose.

Ida's attack on the government's affidavit is equally unavailing. The affidavit describes with specificity a number of other possible techniques that the government might have employed in its efforts and why those techniques probably would not have been effective. It may have been similar in this respect to affidavits presented in support of other applications in this case, but that similarity did not render its language ineffective. Many of the reasons presented by Agent Campi for the authorization of the wiretap are of particular relevance to the Genovese crime family and similar organizations, such as their consciousness of surveillance and the fear of informants to testify. It should come as no surprise that the facts supporting the conclusion that the alternative methods would be unavailing were similar from application to application.

For the reasons explained above, Ida's various arguments for suppression of the evidence intercepted from his cellular phone lack merit. His motion therefore is denied in all respects.

*Bellomo and Generoso—Motions to Suppress*

Defendants Bellomo and Generoso also move for suppression of conversations intercepted from the Ida Cellular phone, arguing that the initial application and its various renewals lacked probable cause.

*Standing*

As a threshold mater, Bellomo lacks standing to make this motion as to the initial wiretap application. This Court held, in *United States v. Montoya–Eschevarria,* 892 F.Supp. 104, 106 (S.D.N.Y.1995), and in its December 27, 1996 Order in regard to other suppression motions by Ida and Generoso, that a defendant who was not a named target or interceptee of a wiretap must submit proof by affidavit that he or she was overheard on the wiretap in order to establish standing to seek suppression of such evidence. Bellomo does not admit that he was intercepted on Ida's cellular phone. He was neither a tar-

get nor a named interceptee in the initial application. The disputed allegations of the government, or the claim by his attorney that Bellomo often spoke with Ida on the phone, do not establish a sufficient interest in the interceptions for Bellomo to have standing. He must establish that his voice was intercepted. Absent a sworn statement by Bellomo or someone with personal knowledge averring that Bellomo's voice was intercepted on the cellular phone, he lacks standing to seek suppression of the evidence that the wiretap on that phone produced. Bellomo's motion to suppress the fruits of the initial order therefore is denied.

### Probable Cause

■ Bellomo and Generoso argue that they are entitled to suppression of the intercepts involving the Ida cellular phone because the government, although it named them as targets in most of the applications, in fact lacked probable cause to believe that they had committed or were about to commit any offense.[4] The government does not now contend that it demonstrated probable cause with respect to Bellomo or Generoso. Rather, its position is that the Fourth Amendment and the statute require, in the relevant respect, only that there be probable cause with respect to its belief that at least one of the individuals named in the order has committed or is about to commit an offense.[5] As there was probable cause to believe that Ida had committed or was about to commit an offense, the government argues, any lack of probable cause as to Bellomo, Generoso or anyone else named in the application is immaterial.

A logical starting point is the statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20. In brief summary, Title III requires that an application for authority to intercept electronic communications contain, among other things, "the identity of the person, if known, committing the offense and whose communi-

cations are to be intercepted ..." 18 U.S.C. § 2518(b)(iv). A judge may authorize interception upon a determination, insofar as is relevant here, that "there is probable cause for belief that an individual is committing, has committed or is about to commit" a relevant offense. Id. § 2518(3)(a). The authorizing order shall specify, among other things, "the identity of the person, if known, whose communications are to be intercepted ..." Id. § 2518(4)(a). Within 90 days after the application is made, the judge shall cause a notice to be given to "the persons named in the order or the application, and such other parties to intercepted communications as the judge may determine ..." Id. § 2518(8)(d). An "aggrieved person" may move to suppress an communication intercepted pursuant to Title III on the grounds, among others, that the communication was unlawfully intercepted or the order of authorization was insufficient on its face. Id. § 2518(10).

■ The statutory scheme thus makes clear, as the Supreme Court confirmed in *United States v. Kahn*, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974), that the government's obligation to name persons in Title III applications is limited to those who, it has probable cause to believe, committed or are about to commit an offense. The government need not seek to discover and name all those who may be overheard.

The next question that logically occurs is as to the consequence, if any, of the government's failure to name in an application a person as to whom probable cause exists. The Court answered that question in *United States v. Donovan*, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). Reasoning that the naming requirement of Section 2518(1)(b)(iv) does not play "a central, or even functional role in guarding against unwarranted use of wiretapping or electronic surveillance," the Court held that suppression is not required in such circumstances. Id. at 437–40, 97 S.Ct. at 673–74 (quoting

---

4. Bellomo was named as a target in all the renewal applications and therefore has standing with respect to the subsequent interceptions.

5. The government acknowledges of course that there must be probable cause also to believe that

particular communications concerning the offense will be intercepted. *See* 18 U.S.C. § 2518(3)(b). Bellomo and Generoso do not question the adequacy of that aspect of the requisite probable cause showing.

*United States v. Chavez,* 416 U.S. 562, 578, 94 S.Ct. 1849, 1857, 40 L.Ed.2d 380 (1974) (internal quotation marks omitted)). While *Donovan* is not dispositive here because this case is its converse, its conclusion with respect to the significance of the naming requirement does tend to suggest that the mistaken naming of a person in an application does not warrant suppression. This is confirmed by the cases that have dealt with the issue.

In *United States v. Shipp,* 578 F.Supp. 980 (S.D.N.Y.1984), Judge Weinfeld rejected substantially the same argument made by Bellomo and Generoso here. Stitmon, one of the movants, sought suppression on the ground that there was no probable cause to believe that he was involved with the suspected criminal activity of another target of the interceptions. *Id.* at 984, 986. But Judge Weinfeld denied the motion on the ground that it misstated the requirements of probable cause. He pointed out that "[t]here is no requirement that probable cause be established with respect to every defendant ultimately indicted" and that the probable cause requirement in the wiretap context is "satisfied by identification of the telephone line to be tapped and the particular conversations to be seized." *Id.* at 986–87 & n. 18.

Other cases are to the same effect. In *United States v. Martin,* 599 F.2d 880 (9th Cir.1979), the Ninth Circuit affirmed the denial of a motion to suppress that was based on the contention that a Title III applicant must establish probable cause as to every probable interceptee, holding that neither the Fourth Amendment nor Title III imposes any such requirement. *Id.* at 884–85. Several other judges of this Court have reached the same conclusion. *United States v. Ambrosio,* 898 F.Supp. 177, 183–85 (S.D.N.Y. 1995); *United States v. Milan–Colon,* No. S2, S3 91 Cr. 685(SWK), 1992 WL 236218, at *16 (S.D.N.Y. Sept. 8, 1992); *United States v. McGuinness,* 764 F.Supp. at 899–900.

This is an entirely sensible result. The Supreme Court already has held in *Donovan* that the failure to name in a Title III application a person as to whom the government has probable cause does not require suppression. As the shelves of reported cases dealing with

the issue in a myriad of factual contexts demonstrates, the question whether probable cause exists in particular circumstances often is an exceedingly close judgment as to which reasonable minds may differ. By requiring suppression if the government mistakenly characterizes as probable cause its showing as to a particular interceptee, the courts would provide an incentive for the government to call all the close cases against naming the individual, as it thereby would ensure admissibility by the omissions, at least if the omissions were reasonable. This would disserve the interests the statute was designed to serve because the effect of the omission would be that the interceptee whose name was omitted would not be entitled, as a matter of right, to the notice contemplated by Section 2518(8)(d). *See Martin,* 599 F.2d at 885; *Ambrosio,* 898 F.Supp. at 184.

Accordingly, the motions of Bellomo and Generoso to suppress the product of the Ida cellular telephone intercepts on the ground that the government lacked probable cause to believe that they had engaged or were about to engage in criminal activity are denied.

*Bellomo's Request for a* Franks *Hearing*

▮▮▮▮ Bellomo asks also that the Court grant a hearing under *Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978), to determine whether Bellomo was misidentified as one of the persons intercepted over Ida's cellular phone. To warrant a *Franks* hearing, a defendant must make a "substantial preliminary showing" that the misidentification arises from the identifying agents "deliberate falsehood or ... reckless disregard for the truth." *Id.*

Bellomo has offered an affidavit by one of his attorneys who, after an "in-depth firsthand examination of the tapes on which Bellomo's voice purportedly appears," claims that the government's identification of Bellomo is incorrect. (Bellomo Reply Mem. 11–12) Bellomo argues that since his lawyer swears that Bellomo was misidentified, and since his misidentification allegedly was critical to a determination of probable cause, he is entitled to a hearing to determine whether the identifying agent was reckless.

The opinion of Bellomo's attorney that the voice on the tape is not Bellomo's, even if correct, is not enough to raise an issue of fact as to whether the agent deliberately or recklessly identified Bellomo. Absent some other evidence, there is no reason to believe that any error, if error there was, was anything but a mistake insufficient to raise a *Franks* problem.

*Ida's Motion to Dismiss Racketeering Act 7(a)*

 Racketeering Act 7(a) in the RICO counts alleges that defendant James Ida and others committed extortion by:

> "obtaining property, that is, the right of a labor organization's members to free speech and democratic participation in union affairs ... and to loyal and responsible representation by the members' union officers ... from and with the consent of officers and employees of [said union] which consent would have been and was induced by the wrongful use of actual and threatened force, violence, and fear...."

in violation of the Hobbs Act.[6] Ida seeks to have Racketeering Act 7(a) dismissed on the ground that the union members' rights are not "property" within the meaning of Section 1951(b)(2) and so his alleged actions do not state a violation of the statute.

Ida's argument is flatly contrary to the established law in this Court. Every judge in this district to consider the matter has found that union members' rights to free speech and democratic participation in union affairs are property for the purposes of the Hobbs Act. *See United States v. Local 1804-1*, 812 F.Supp. 1303, 1335 (S.D.N.Y. 1993), *aff'd in part*, 52 F.3d 1173 (2d Cir. 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 934, 133 L.Ed.2d 861 (1996); *United States v. District Council of New York City*, 778 F.Supp. 738, 754 (S.D.N.Y.1991); *United States v. International Brotherhood of Teamsters*, 765 F.Supp. 1206 (S.D.N.Y.1991), *appeal dismissed*, 1991 WL 346072 (2d Cir. 1991), *cert. denied*, 502 U.S. 1075, 112 S.Ct. 975, 117 L.Ed.2d 139 (1992); *Rodonich v. Local 95*, 627 F.Supp. 176, 178–79 (S.D.N.Y. 1985). So too have the Third and Sixth Circuits. *See United States v. Debs*, 949 F.2d 199, 201–02 (6th Cir.1991); *United States v. Local 560*, 780 F.2d 267, 281–82 (3d Cir.1985).

Ida presents no directly contrary authority. Rather, he contends that language in *Town of West Hartford v. Operation Rescue*, 915 F.2d 92 (2d Cir.1990), in which the Court of Appeals said that "the term 'property' cannot plausibly be construed to encompass altered official conduct" for Hobbs Act purposes, *id.* at 102, requires the conclusion he advocates. (Ida Reply Mem. 11) He contends too that this result is required by *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).

The plaintiffs in *Town of West Hartford* contended, *inter alia*, that the defendants, in violation of the Hobbs Act, "extorted" a softer municipal reaction to their protest activities by the threat, among others, that an unaltered municipal policy would require added police expenditures by the town and restrict its ability to provide police protection for other citizens. 915 F.2d at 95–96, 102. The comment relied upon by Ida came in the court's rejection of that claim. The court went on to say that "[v]irtually any conduct that elicits a governmental response will require activity by ... salaried government employees" and that "[i]t is simply not tenable to translate the activation of such a response into a Hobbs Act obtention of 'property.'" *Id.* at 102.

The Circuit's holding in *Town of West Hartford* was a response to an argument, the

---

6. The statute provides in relevant part:

> "(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

> "(b) As used in this section—

> \* \* \* \* \* \*

> "(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951.

logical implication of which would have transformed into a violation of the Hobbs Act almost any conduct which required a governmental body to consider that a response other than that which actually occurred might be more expensive. The Court explicitly adverted to the First Amendment difficulties that such a view might raise. *Id.* at 102. The decision therefore turned on the special difficulties of applying the Hobbs Act in the public context. It cannot be applied uncritically outside that context, as indeed is suggested by the fact that the Court reiterated its prior holding that " 'property' under the Act 'includes, in a broad sense, any valuable right considered as a source or element of wealth ...' " *Id.* at 101 (quoting *United States v. Tropiano,* 418 F.2d 1069, 1075–76 (2d Cir.1969), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1258, 1262, 25 L.Ed.2d 530 (1970)).

This case presents a fundamentally different situation. Unions are not governmental bodies. Their members' rights to participate effectively in their affairs have direct economic value because the advancement of the members' economic interests through collective action is the *raison d'etre* of unions. The history of labor corruption in this country is an eloquent testament to the proposition that the suppression of union democracy often has been closely linked with the sacrifice of the interests of the rank and file to the enrichment of union leaders and those who have corrupted them. Thus, unlike the interest in unaltered official conduct that was put forward in *West Hartford,* the interests at stake in this case, although intangible, are very similar to the intangible economic rights held to be property in cases cited by the *West Hartford* panel. They are, to quote *Tropiano,* "valuable right[s] considered as a source ... of wealth ..." 418 F.2d at 1075–76.

Ida next argues that the Supreme Court's decision in *McNally*—which held that the term "property" as used in the mail fraud statute, 18 U.S.C. § 1341, does not include "the intangible right of the citizenry to good government," 483 U.S. at 356, 107 S.Ct. at

2879 [7]—requires the conclusion that Racketeering Act 7(a) does not state an offense. The argument assumes, of course, that the term "property" as used in the mail fraud statute has the same meaning as in the Hobbs Act, a debatable proposition in view of the different histories of the two statutes. *See Debs,* 949 F.2d at 201 n. 2; *cf. McNally,* 483 U.S. at 356–58, 107 S.Ct. at 2879–81. Even granting that assumption, however, the result that Ida advocates does not necessarily follow for substantially the reasons already discussed—the link between tangible economic benefits and the free exercise of union members' rights is considerable stronger than that between such readily recognizable "property" and the honest services of public officials.

In all the circumstances, this Court sees no reason to depart from the considered and established interpretation which courts universally have given to the term "property" in the Hobbs Act. Racketeering Act 7(a) therefore is legally sufficient. Ida's motion is denied.

*Schenone's Motion to Dismiss Racketeering Act 32 or for Other Relief*

*Double Jeopardy*

 Count one of the indictments alleges a conspiracy to conduct the affairs of the alleged enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). Count two alleges that specified defendants actually conducted the affairs of the alleged enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962(c). Racketeering Act 32, which is incorporated in counts one and two in the original indictment (Racketeering Act 35 of counts one and two of the superseding indictment), alleges that:

"It was a part of the pattern of racketeering activity that from on or about November 1, 1994, through in or about April 1995, in the Southern district of New York and elsewhere, James Ida ..., and John Schenone ..., and others known and unknown, unlawfully, willfully, and knowingly did

**7.** Much of *McNally* of course effectively was overruled by the enactment of 18 U.S.C. § 1346. This amendment does not necessarily dispose of

defendant's argument because it applied only to the statutes immediately affected by *McNally,* 18 U.S.C. §§ 1341 and 1343.

644

transport in interstate and foreign commerce a good, namely, a Caterpillar 950B Front End Loader, having a value in excess of $5,000, knowing the same to have been stolen and converted, in violation of Title 18, United States Code, Sections 2314, and 2."

Defendant John Schenone seeks dismissal of this racketeering act, claiming that its inclusion in these indictments would subject him to double jeopardy or is precluded by collateral estoppel. Alternatively, he seeks the unsealing of the grand jury minutes.

The operative facts may be stated briefly. In May 1995, Schenone was arrested and charged in the Eastern District of New York with conspiring to transport stolen property during the period beginning in October 1994 and continuing until May 11, 1995. (See Schenone Mem.Ex. A) Insofar as is relevant here, the overt act with which he was charged involved the theft of a front end loader on December 15, 1994. Schenone pleaded guilty on July 14, 1995.[8] He was sentenced after the court received a presentence report in which the Probation Office stated the view that the offense was unrelated to organized crime activities of the Colombo family, which then were the subject of a separate investigation.

The RICO conspiracy with which Schenone is charged in this case allegedly commenced in 1980 and continued to the date of the present indictments, June 1996 in the case of the original indictment and December 1996 in the case of the superseder. The racketeering act in these indictments to which Schenone objects involved the same front end loader that was a subject of the Eastern District case. The last predicate act with which Schenone is charged in this case is said to have occurred in March 1995. (See Gov.Mem. 146)

Schenone contends that the indictment, in order to pass double jeopardy muster, must "allege 'some type of post-plea unlawful conduct' on the part of the defendant or 'post-plea accumulation of evidence' which establishes a second predicate offense or participation in a criminal enterprise." (Schenone Mem. 4) (quoting United States v. Persico, 620 F.Supp. 836, 844 (S.D.N.Y.1985) ("Persico I")) He argues that he is entitled to dismissal of this racketeering act because the indictments in this case do not allege any predicate act by, or the accumulation by the government of pertinent evidence against, him after the date of his guilty plea in the Eastern District of New York.

It is helpful in dealing with Schenone's argument to begin with the language in Persico I upon which Schenone relies. The indictment in that case charged four of the defendants with substantive violations of, and conspiracy to violate, RICO. Eight of the alleged racketeering acts involved a bribery scheme. All of the moving defendants previously had been convicted of one offense or another relating to that scheme. The question presented was whether a defendant previously convicted of an offense later could be charged in a RICO indictment with a predicate offense consisting of the previously convicted conduct. The district court applied the analysis laid out in Garrett v. United States, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), where the Court held that a prior felony conviction could be relied upon by the government, consistent with the Double Jeopardy Clause, to support a subsequent continuing criminal enterprise indictment. The district court concluded first that Congress regarded RICO violations as crimes separate from the predicate offenses and intended separate punishment. 620 F.Supp. at 840–44. And it held that the reliance on prior convicted conduct for predicate offenses in the RICO indictment did not violate the Double Jeopardy Clause because the predicate acts are not lesser included offenses. Id. at 844–46. In the course of this analysis, the district court made the observation to which Schenone points:

"Although one or more prior convictions or racketeering acts, obtained pursuant to a plea agreement, are unquestionably valid to support a RICO charge, there must also exist an allegation of either (1) some type

8. Schenone's plea agreement specifically provided that "[t]his agreement does not bar the use of such conduct as a predicate act ... in a subsequent prosecution including, but not limited to, a prosecution pursuant to the RICO statute." (Gov.Mem. 141)

of post-plea unlawful conduct, [*Garrett,* 471 U.S. at 799, 105 S.Ct. at 2422], or (2) a post-plea accumulation of evidence sufficient to establish either a second predicate offense or participation in a criminal enterprise, *see Brown,* 432 U.S. at 169 n. 7, 97 S.Ct. at 2227 n. 7; *cf. Oyler v. Boles,* 368 U.S. 448, 452 n. 6, 82 S.Ct. 501, 505 n. 6, 7 L.Ed.2d 446 (1962). This test would not, as the Supreme Court cautioned against [in] *Garrett,* leave prosecutors with the untenable choice of having to 'choose between prosecuting the [racketeer] on the offense offense of which it could prove him guilty or releasing him with the idea that he would continue his [racketeering] activities so that the Government might catch him [again] and then be able to prosecute him on the [RICO] offense.' [471 U.S. at 785–87] 105 S.Ct. at 2415. At the same time, this standard would preclude an ambitious federal prosecutor from scraping together a defendant's two prior pleas to predicate acts and charging him, although he had done nothing other than that for which he had pleaded guilty and was sentenced, under the RICO statute. In so doing, it allows courts to preserve the finality of judgments in criminal prosecutions and protect the defendant from prosecutorial overreaching without needlessly hampering federal prosecutors in their enforcement of federal criminal laws." *Id.* at 844.

The district court proceeded to note, in denying the motions to dismiss, that each of the moving defendants was charged in the RICO indictment before it with "a variety of separate post-plea racketeering acts." *Id.* at 845.

The Second Circuit affirmed *Persico I* on an interlocutory appeal, holding that it had applied *Garrett* correctly. *United States v. Persico,* 774 F.2d 30 (2d Cir.1985) ("*Persico II*"). It specifically noted, however, that:

"We need not and do not decide whether, as Judge Keenan believed, 620 F.Supp. at 840, subsequent RICO charges can survive double jeopardy objections only if the subsequent indictment alleges conduct that post-dates the plea to the prior charges or if evidence, accumulated subsequent to that plea, establishes either a second predicate offense or participation in a criminal enterprise." *Id.* at 32.

The defendants were convicted. On the subsequent appeal, the Second Circuit expressed "serious doubt as to whether evidence of post-plea involvement is necessary to defeat a double jeopardy challenge to RICO convictions based on predicate acts that were the subject of prior guilty pleas." *United States v. Persico,* 832 F.2d 705, 711 (2d Cir.1987) ("*Persico III*"). It was not, however, required to decide the issue in view of the presence of such post-plea involvement in that case. *Id.* at 711–12. Nor has it been compelled to do so in subsequent cases, as each case potentially raising the issue has revealed such post-conviction activity. *United States v. Giovanelli,* 945 F.2d 479, 492 (2d Cir.1991); *United States v. Coonan,* 938 F.2d 1553, 1563 (2d Cir.1991), *cert. denied,* 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992); *United States v. Gambino,* 920 F.2d 1108, 1112–12 (2d Cir.1990), *cert. denied,* 502 U.S. 810, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991); *United States v. Scarpa,* 913 F.2d 993, 1013–14 & n. 8 (2d Cir.1990).

In considering whether the Double Jeopardy Clause bars a subsequent RICO indictment to the extent it alleges prior convicted conduct as a predicate act, it is useful to bear in mind that the *Persico* cases together stand for the proposition that RICO offenses are crimes separate and distinct from the predicate acts of racketeering. As the district court wrote in *Persico I,* "[t]he language, structure and legislative history of RICO … make Congress' intent … unmistakably clear." 620 F.Supp. at 841. *Accord, Persico II,* 774 F.2d at 32. This is critical in analysis of the double jeopardy issue.

■ The Supreme Court wrote in *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076–77, 23 L.Ed.2d 656 (1969), and reiterated in *Garrett,* 471 U.S. at 777, 105 S.Ct. at 2410–11, that the Double Jeopardy Clause protects against "a second prosecution for the same offense" after either an acquittal or a conviction and prevents multiple punishment "for the same offense." *Accord, Persico III,* 832 F.2d at 710; *Persico I,* 620 F.Supp. at 839. As a RICO violation is an offense separate and apart from the

predicate acts, it cannot be said that prosecution on RICO charges based on a predicate act which resulted in a prior substantive conviction is a second prosecution, or that a RICO conviction results in multiple punishment, "for the same offense" as the predicate act. That is true irrespective of whether the RICO prosecution, although relying on conduct that resulted in a prior conviction, alleges additional post-conviction conduct. Any different view would be inconsistent with the premise that the RICO offense is an offense distinct from the underlying predicate acts.

To be sure, the language in *Persico I* upon which Schenone relies reflects an additional consideration, concern with prosecutorial overreaching. The government, *Persico I* suggests, ought not to have two bites at the apple, at least if it is or should have been fully aware of the evidence that would be required for the second prosecution at the time of the first. This is a concern that has been adverted to elsewhere in double jeopardy jurisprudence. *E.g., Garrett*, 471 U.S. at 795–96, 105 S.Ct. at 2419–20 (O'Connor, J., concurring); *Ohio v. Johnson*, 467 U.S. 493, 498–99, 104 S.Ct. 2536, 2540–41, 81 L.Ed.2d 425 (1984); *United States v. DiFrancesco*, 449 U.S. 117, 128, 136, 101 S.Ct. 426, 432–33, 437, 66 L.Ed.2d 328 (1980). And certainly there is reason to question whether the government should be permitted to subject a defendant to successive trials "affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Burks v. United States*, 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978). But this Court doubts that this concern properly may be grounded in the Double Jeopardy Clause in view of a change in the law since *Persico* and, if it may, whether post-plea unlawful conduct is the only means of addressing that concern.

If one accepts, as we must, that (1) the Double Jeopardy Clause does not forbid successive prosecutions for different offenses, and (2) RICO violations are offenses different from the predicate acts they comprehend, there could be only two bases for precluding a RICO prosecution, even in the circumstances postulated by *Persico I*—a subsequent RICO violation alleged to consist entirely of two predicate acts, each of which had resulted in a prior conviction on a substantive charge. The first would be that each prior conviction barred subsequent prosecution for another offense involving the same *conduct*. The other would be a notion that the Double Jeopardy Clause requires the government to join in a single indictment all charges then known to it. Neither, this Court concludes, is a tenable proposition, at least as applied in the circumstances of this case.

The first of these possible bases was rejected by the Supreme Court in *United States v. Dixon*, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), after the conclusion of the *Persico* litigation. *Dixon* expressly overruled *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), and held that the Double Jeopardy Clause does not preclude successive prosecutions for different offenses even where conduct constituting an offense for which the defendant already has been convicted is an essential element of the second alleged crime. Hence, the fact that Schenone already has been convicted of an offense involving the transport of the stolen front loader does not alone preclude a RICO charge which also rests in part on the transport of the front end loader.

This Court is not aware of anything in the Double Jeopardy Clause, and the defendant has cited nothing, that suggests a requirement that the government join all criminal conduct of which it is aware in one indictment save the lesser included offense doctrine, which holds that the government ordinarily may not try a defendant for a more serious offense after it has convicted him of a lesser included offense. *Brown v. Ohio*, 432 U.S. at 168–69, 97 S.Ct. at 2226–27. As *Garrett* suggested, however, " 'lesser included offense' principles of double jeopardy" cannot readily be transposed to "multilayered" conduct such as that at issue here. 471 U.S. at 789, 105 S.Ct. at 2417; *accord, Persico III*, 832 F.2d at 711. If they can be transposed at all, moreover, the transposition must be sensitive to the legitimate interests of law enforcement as well as the concerns of prospective defendants.

Any requirement of joinder must rest on the notion that the Double Jeopardy Clause prohibits the government, with all its resources, from subjecting a defendant to successive trials if the prosecutions, although involving technically different offenses, are sufficiently similar. While *Dixon* precludes the conclusion that any RICO prosecution— even a RICO prosecution based exclusively on two predicate acts, each of which had been the subject of a prior conviction—is the "same offense" as the predicate acts, it perhaps is arguable that the Double Jeopardy Clause is sufficiently broad to protect against successive prosecutions where the defendant allegedly has done little or nothing wrong beyond whatever was the focus of the earlier prosecutions. That indeed seems to have been the principal concern in *Persico I,* where Judge Keenan explained that the standard there proposed "would preclude a federal prosecutor from scraping together a defendant's two prior pleas to predicate acts and charging him, *although he had done nothing other than that for which he had pleaded guilty and was sentenced,* under the RICO statute." 620 F.Supp. at 844 (emphasis added).

Assuming *arguendo* that the Double Jeopardy Clause embodies such protection, although that is doubtful after *Dixon,* the standard employed must be responsive to the underlying concern. Post-plea criminal conduct or post-plea accumulation of evidence of a second predicate offense could serve the function of depriving the government of two bites at the apple in what otherwise in substance would be the same case. But so too could other circumstances distinguishing a subsequent RICO prosecution from prior prosecutions of predicate acts. Here, for example, Schenone is charged with racketeering acts including participation in a murder conspiracy, solicitation to commit another murder, loansharking, mail and wire fraud in connection with the San Gennaro street festival, and obstruction of justice as well as the unlawful transportation of the stolen front end loader. To suggest that Schenone now is being prosecuted although he is not alleged to have done anything unlawful other than that for which he pleaded guilty previously would be ridiculous. That would be true irrespective of whether any of the predicate acts with which he is charged in this case pre- or post-dates the end of the prior prosecution. There simply is not the degree of congruence between the prior prosecution and this one to justify a serious concern with similar successive prosecutions.

This view is buttressed by the serious issues for law enforcement that would be created were Schenone's argument accepted. If a law enforcement agency conducting complex, lengthy investigations of organized crime were to learn of unlawful conduct by a low or middle ranking figure before the investigation had borne the fruit ultimately hoped for, it would be put to a hard choice in determining whether to prosecute. Prompt prosecution on non-RICO charges would entail the risk that the government would not learn of another predicate act, post-conviction, that would enable it to charge the defendant with the RICO offense that otherwise would be chargeable if the investigation reached a successful conclusion. If the government, on the other hand, were to defer prosecution in order to preserve the RICO option in the event the investigation were successful, however, it would be risking the possibility that the passage of time ultimately would prevent prosecution of the defendant at all should the broader investigation fail. As the Supreme Court indicated in *Garrett,* the Double Jeopardy Clause is not intended to "force the Government's hand in this manner." 471 U.S. at 789–90, 105 S.Ct. at 2416–17.

■ Accordingly, the Court holds that Schenone's double jeopardy challenge to the front end loader racketeering act is without merit. Given *Dixon,* the Double Jeopardy Clause does not preclude a RICO prosecution even where all the predicate acts have been the subject of prior prosecutions. If it does limit RICO prosecutions based on predicate acts which have been the subject of prior prosecutions, which this Court doubts, it does so only where the RICO charge overlaps the prior prosecution to an extent far greater than is true here, a point on which the existence of post-prosecution misconduct is relevant but on which it is not dispositive.

■ Nor need the Court rest at this point with respect to the RICO conspiracy charged in count one. The conspiracy count alleges that Schenone conspired to violate RICO from in or about 1980 until the date of the indictment, June 1996 in the case of the original indictment and December 1996 in the case of the superseder. The essence of the offense of conspiracy is an unlawful agreement, and a conspirator's adherence to a conspiracy continues for its entire duration absent withdrawal. *E.g. United States v. Gotti*, 644 F.Supp. 370 (E.D.N.Y.1986). In consequence, the conspiracy count in these indictments alleges post-plea participation in the RICO conspiracy and thus satisfies the standard articulated in *Persico I*.[9]

For the reasons explained above, this Court finds that the inclusion of the front end loader racketeering act does not violate the Double Jeopardy Clause. Schenone's motion to dismiss the act on double jeopardy grounds is denied.

*Collateral Estoppel*

■ Schenone claims also that the inclusion of this racketeering act in the indictments violates principles of collateral estoppel in view of the presentence report in the Eastern District case where, he says, the Probation Office said that the front end loader conspiracy was not related to organized crime. This argument has no merit for several reasons, most notably the fact that Schenone's plea agreement specifically provided that his guilty plea might be used in a future RICO prosecution. What the Probation Department thought of the issue of Schenone's organized crime connections is of no moment.

*Grand Jury Minutes*

■ Schenone seeks disclosure of the grand jury minutes under FED.R.CRIM.P.

6(e)(3)(C)(ii), which authorizes a court to disclose grand jury minutes "upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." He contends that disclosure is warranted because the Eastern District presentence report with respect to the previous front loader conviction "shows that predicate act 32 has no place in the instant indictment; [and] that the Government was in possession of facts showing that the offense was not in furtherance and or the employment of racketeering activity." (Schenone Reply Mem. 3) The argument is frivolous because the presentence report says no such thing. It states only that the front loader incident was independent of "a separate organized crime investigation pertaining to [Schenone's] association with known *Columbo* family ... members ..." (Schenone Mem.Ex. B, ¶ 33) (emphasis added) Nothing suggests that the incident was unconnected to the Genovese family.

Schenone has failed to show particularized need for the disclosure of the grand jury minutes. His motion therefore is denied. *See United States v. Moten*, 582 F.2d 654, 662 (2d Cir.1978).

*Severance*

A number of the defendants have moved under FED.R.CRIM.P. 14 and FED.R.CRIM.P. 8 for severance of their trials.

■ In considering motions for severance, it is important to bear in mind that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537–38, 113 S.Ct. 933, 936–37, 122 L.Ed.2d 317 (1993). However, *United States*

---

9. This is not true of the substantive RICO count. The statute makes it unlawful for covered persons "to conduct or participate, directly or indirectly, in the conduct of such enterprises' affairs *through a pattern of racketeering activity.*" 18 U.S.C. § 1962(c) (emphasis supplied). "Racketeering activity" is a defined term that refers to predicate crimes. *Id.* § 1961(1). In consequence, the gravamen of the offense is the participation in the affairs of the enterprise through the commission of a pattern of predicate crimes. If the government's reliance on the front end loader predicate act may be squared with the

Double Jeopardy Clause only if Schenone is charged with a predicate act that post-dates the front end loader prosecution, its reliance is barred. The last predicate act of which Schenone is accused in this case allegedly occurred in March 1995, approximately four months before his guilty plea in the Eastern District case. The allegation that Schenone participated in unspecified activity relating to the alleged enterprise after the date of the plea is immaterial because post-plea activity that does not amount to predicate acts is not punishable on the substantive RICO count.

*v. Casamento,* 887 F.2d 1141, 1151–52 (2d Cir.1989), *cert. denied,* 495 U.S. 958, 110 S.Ct. 2564, 109 L.Ed.2d 746 (1990), altered this preference in multi-defendant trials where the presentation of the prosecution's case is likely to require more than four months. In such cases, "the judge should oblige the prosecutor to present a reasoned basis to support a conclusion that a joint trial of all the defendants is more consistent with the fair administration of justice than" a division of the case into two or more trials. *Id.,* at 1152. Additionally, "the judge should oblige the prosecutor to make an especially compelling justification for a trial of more than ten defendants." *Id.*

On July 17, 1996, the Court—then confronted with 19 defendants and a preliminary estimate that the government's case would last four to six months—informed the parties that it would follow the procedures set out in *Casamento* for the determination of severance in multi-defendant RICO trials. It ordered the government to (a) provide the Court with a good faith estimate of the time anticipated to present the government's case; and (b) justification of the need for a trial exceeding four months, and especially a joint trial of more than ten defendants. On October 11, 1996, the government replied that it could not justify a single trial of all the defendants in this case [10] and proposed a severance into two trials, one with ten defendants, the other with nine. The proposed first trial—for which the government's case was estimated to take four months—would include defendants Bellomo, Generoso, Ida, Frustaci, Cestaro,[11] Schenone, Pisapia, Zacchia, Cerami, and Ruggiero (the "Principal RICO Defendants"), all of whom would be included in this proposed trial because they are charged with involvement in the same, broad, ongoing criminal enterprise. The proposed second trial would join Barrett, Coi-

ro,[12] and Autuori (the "Secondary RICO Defendants"), all of whom also are named on the RICO counts, together with Saggese, Pisacano, James Pisacano, Setford, Batista, and Romano (the "Gambling Defendants"). The Gambling Defendants are not named on any RICO charges.

Defendants Saggese, Romano, Cestaro, Pisapia, Zacchia, James Pisacano and Joseph Pisacano seek severance beyond that proposed by the government.[13] With the exception of the Pisacanos, all of the moving defendants argue essentially that joining their trials to those of defendants charged with more serious crimes would result in prejudicial spillover and deprive them of their rights to a fair trial. The Pisacanos argue that they are joined improperly in violation of FED.R.CRIM.P. 8(b).

■■■ A defendant seeking severance under Rule 14 has the " 'extremely difficult burden' " of proving not merely that he would be prejudiced by a joint trial, but that the prejudice would be so great as to deprive him of his right to a fair trial. *Casamento,* 887 F.2d at 1149 (quoting *United States v. Carpentier,* 689 F.2d 21, 27 (2d Cir.1982)); *accord, United States v. Rosa,* 11 F.3d 315, 341 (2d Cir.1993), *cert. denied,* 511 U.S. 1042, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994); *United States v. Friedman,* 854 F.2d 535, 563 (2d Cir.1988), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). Many courts have recognized also that the prejudice to the defendant must be weighed against the benefit to courts and jurors that accrue from joint trials. *See Casamento,* 887 F.2d at 1151 (citing cases); *United States v. Lanza,* 790 F.2d 1015, 1019 (2d Cir.), *cert. denied,* 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986).

---

**10.** One is left to wonder why the government indicted as it did.

**11.** Defendant Cestaro pleaded guilty on January 15, 1997. Thus, the proposed ten defendant trial actually would have only nine defendants.

**12.** Defendant Coiro has pleaded guilty to two counts in the indictment. Thus, as a practical matter, the proposed nine defendant severed trial

actually would have eight defendants. (*See* Gov. Mem. 150–51)

**13.** Defendants Ida and Autuori have objected to a joint trial of the entire nineteen defendant indictment, but make no further objection to a severance along the lines proposed by the government, of which they have been on notice for some time. (Ida Mem. 65–67; Autuori Mem. 1–2)

The motions by defendants Pisapia and Zacchia do not show that sufficient prejudice would result from a joint trial to justify severing them from trial with the other Principal RICO Defendants. They argue basically that because they are not named in the most serious charges in the indictment, they would be prejudiced by the presentation of the evidence that tends to establish the more serious crimes. However, "[a] RICO charge allows the government to introduce evidence of criminal activities in which a defendant did not participate to prove the enterprise element." *United States v. Tellier*, 83 F.3d 578, 582 (2d Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 373, 136 L.Ed.2d 262 (1996). In addition, courts have held that the inclusion in a joint trial of evidence of more serious acts by other members of a criminal organization does not deny another member of that organization a fair trial. *See Rosa*, 11 F.3d at 342. Thus, even if the case against Pisapia and Zacchia were severed, much of the evidence that these defendants object to would be admitted in order to establish the enterprise element of the RICO charge. While counsel argues that this evidence perhaps could be stipulated, in an effort to minimize its damaging effect, there still is little doubt that the government would have the right to put much of the same evidence before the jury in a severed case that it might offer in a joint trial. Thus, even assuming that these defendants would be prejudiced by a joint trial, which the Court does not accept, it is not clear that a separate trial would insulate them from the prejudice they claim they would suffer.

Zacchia and Pisapia may be correct in arguing that the evidence of alleged murders involving other defendants would not be admissible at a separate trial and that such evidence, if admitted without explanation, might prejudice the jury against all defendants in a joint trial. However, numerous courts have held in similar situations that a jury instruction could counteract any possible prejudice to the defendants. The Court will instruct the jury to consider the guilt of each defendant individually and only with regard to the evidence admitted as to that defendant. This instruction will be sufficient to counteract any spillover prejudice from the charges against the other defendants. *See United States v. Hernandez*, 85 F.3d 1023, 1029–30 (2d Cir.1996); *United States v. Zackson*, 6 F.3d 911, 922 (2d Cir.1993); *United States v. Lasanta*, 978 F.2d 1300, 1307 (2nd Cir.1992) ("the district court countered any possible spillover with specific instructions to the jury ... that the jury should consider the evidence separately as to each defendant."); *Casamento*, 887 F.2d at 1153 (instructions to afford each defendant separate consideration leads to finding of no unfair prejudice) (citing *United States v. Carson*, 702 F.2d 351, 367 (2d Cir.1983)); *United States v. Potamitis*, 739 F.2d 784, 790 (2d Cir.), *cert. denied*, 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984); *United States v. Gallego*, 913 F.Supp. 209, 218 (S.D.N.Y.1996).

In addition to finding no sufficiently serious risk of prejudice from a joint trial, the Court notes that judicial resources will be saved by avoiding another long trial on the RICO enterprise in question in this case. Furthermore, Zacchia and Pisapia are charged with many crimes in common with the RICO defendants, and there is a presumption that these charges should be tried together. The inclusion of Zacchia and Pisapia in the trial with the other Principal RICO Defendants is proper, and their motions for severance are denied.

The motions by defendants Saggese, Romano, and the Pisacanos are markedly different from those of Zacchia and Pisapia. Absent severance, these defendants would face a lengthy trial that would include evidence of a RICO enterprise in which none of them is charged with participating. This evidence might prejudice these defendants significantly because the trial would include a great deal of evidence about an organized crime enterprise and its operations which would not be presented at a separate trial and which is not alleged to have been a part of their criminal activity. Thus, there is clear potential for spillover prejudice in this case. Nor, as the government's proposal nearly concedes, is there any reason to subject these defendants to a lengthy RICO trial, much of which will have nothing to do with them. The Gambling Defendants there-

fore will be tried separately from the Principal RICO Defendants.

The next question is whether Autuori and Barrett, who are named on the RICO counts, should be tried with the Gambling Defendants, as the government proposes. Doing so would be unfair to the six Gambling Defendants. The Gambling Defendants are alleged to have committed only a small number of violations of the gambling laws, yet the government proposes to have them go through a trial in which a large criminal enterprise will be alleged. This state of affairs would be unnecessarily prejudicial to the Gambling Defendants, and this prejudice suggests that they should not be tried with Autuori and Barrett.

In addition to the unfairness of presenting the RICO evidence at the Gambling Defendants' trial, severance of Autuori and Barrett from the Gambling Defendants is warranted because this Court concludes that judicial economy thus would be served. There simply is no good reason to force the judge in the gambling case to conduct a trial involving various RICO allegations, many of which will be presented in the trial of the Principal RICO Defendants. For all these reasons, the Court directs that the Gambling Defendants be tried separately from Autuori and Barrett.[14]

■ This leaves the question of how Autuori and Barrett should be tried. The Court has the power, under FED.R.CRIM.P. 13, to order that "two or more indictments ... be tried together" as long as all of the charges against all of the defendants could have been brought in one indictment. Here, the original indictment joined all of the charges against Autuori and Barrett with those against the Principal RICO Defendants, a joinder which neither Autuori nor Barrett claimed was impermissible under Rule 8. A joint trial of the superseding indictment against the Principal RICO Defendants and the original indictment against

Autuori and Barrett would serve the interests of judicial economy, as both cases involve the same RICO allegations. A separate trial of Autuori and Barrett alone would be a significant waste of judicial resources. Additionally, Autuori and Barrett would suffer no serious prejudice from a joint trial with the Principal RICO Defendants for the reasons explained in regard to the motions by Zacchia and Pisapia.[15]

Such a joint trial would not raise a *Casamento* problem. With the plea of Cestaro, a joint trial of the Primary and Secondary RICO Defendants now would have only eleven defendants, even assuming no further pleas. Moreover, the Court is convinced that the presentation of the government's case in such a trial is likely to take less than four months. While the government estimated four months for its case in the trial of the ten Principal RICO Defendants, the estimate assumed that Cestaro would go to trial. He was a major figure in the case. He was charged with seventeen RICO predicate acts (including nine of which no other defendants are accused) and over thirty substantive offenses (including more than a dozen of which no other defendants are accused). His plea took a substantial part of the case out of the trial, thus rendering the four month estimate excessive. Although Barrett, and to a lesser extent, Autuori are charged with some predicate acts unique to them, the incremental trial time added by their inclusion is quite likely to be significantly less than the time saved by Cestaro's plea. Hence, a trial which includes Autuori and Barrett but not Cestaro is quite likely to be shorter than the government's estimate before Cestaro's plea. As the case now stands, the joint trial of Autuori and Barrett should not result in a trial in which the government's case would exceed the four month guideline set up in *Casamento,* and the Court conceives of no reason why such a joinder should not be ordered.

---

14. Since the Court has granted the Pisacanos' motions for severance under Rule 14, it need not consider their argument under Rule 8(b), which sought similar relief. The Court sees no need for a further severance on any of the grounds advanced by the Pisacanos.

15. Autuori's motion to be severed from the nineteen defendant trial, to the extent that it objects to being tried with the other RICO defendants, is denied for the reasons expressed in the denial of the similar motions made by Zacchia and Pisapia.

The government has elected, on the record, to proceed to trial on the superseding indictment, which charges the Principal RICO Defendants. All severance motions with regard to the superseder are denied. As respects the defendants remaining on the original indictment, the trial of defendants Saggese, Joseph Pisacano, James Pisacano, Setford, Batista and Romano is severed from that of Autuori and Barrett. Autuori and Barrett, the remaining defendants on the original indictment, will be tried together with the defendants on the superseding indictment under FED.R.CRIM.P. 13.

### The Forfeiture Allegations

Generoso moves to dismiss the forfeiture allegations. Schenone joins in the motion. They contend, first, that the forfeiture allegations fail "to provide notice of the government's claim." (Generoso Mem. 4) Second, they argue that they are improper because they do not allege that any of their property "was derived, directly or indirectly, from the racketeering activity alleged or that any such property is subject to forfeiture." (Generoso Mem. 4) Neither of these arguments has merit.

■ As Generoso's silence on the point in response to the government's brief seems to recognize, the government quite adequately has put Generoso on notice that his property is subject to forfeiture. The indictment states that Generoso and Schenone have property which constitutes proceeds from racketeering activity and that the government will seek its forfeiture. The indictment further states that the government will seek substitute assets, if necessary, in the amount subject to forfeiture. Generoso has, or shortly will have, a bill of particulars outlining exactly what property is subject to forfeiture.[16] (Gov.Forfeiture Mem. 8–9)

The notice that Generoso and Schenone received was sufficient. As the Court of Appeals reasoned in *United States v. Grammatikos*, 633 F.2d 1013, 1024 (2d Cir.1980):

"Though pleaded in barebones statutory language, the indictment advised appellant that the government would seek forfeiture of virtually all of his property. Furthermore, the bill of particulars identified each item of property deemed susceptible to seizure and enabled appellant to marshall evidence in defense of them. Plainly he was not prejudiced because those properties were specified in a bill of particulars rather than in the indictment itself." 633 F.2d at 1024.

■ Generoso argues next that the forfeiture allegations fail because they do not allege that Generoso derived any proceeds from the racketeering activity alleged against him. In essence, Generoso claims that the forfeiture allegations can not apply to him because the indictment specifies certain predicate acts that allegedly resulted in forfeitable property, and Generoso is not charged in any of those predicate acts. He argues that:

"[t]he indictment stakes out a position—that the proceeds forfeitable amount to $18,386,000 and that they derive from specific, identified racketeering acts not charged against Mr. Generoso. These other racketeering acts add up to the total forfeitable proceeds of $18,386,000. Thus, it is clear that the indictment deliberately and necessarily excludes the racketeering acts charged against Mr. Generoso from those that produced forfeitable proceeds." (Generoso Mem. 3)

Generoso makes a number of errors in his argument.[17] To begin with, the indictment does not stake out the position that the forfeitable property amounts to $18,386,000. Rather, it states in paragraph 140 that the "Cash Proceeds" of the alleged racketeering enterprise amount to that sum, and in paragraph 139 specifically notes that the forfeitable assets are "not limited to" those listed in

---

**16.** The Court expresses no view as to whether the forfeiture allegations afforded sufficient notice in the absence of the particulars provided by the government.

**17.** This argument has little application to Schenone, who is alleged to have committed numerous predicate acts that are specified in the indictment as having garnered forfeitable assets. However, to the extent that he would advance this argument, the Court's discussion applies to him as well.

paragraph 140. Therefore, his argument that the proceeds sought are limited to those related to the specified racketeering acts is incorrect.[18]

Additionally, Generoso argues that "since [he] is not alleged to have engaged in any racketeering activity that resulted in forfeitable proceeds ... none of his assets is subject to forfeiture." (Generoso Mem. 3) Generoso overlooks paragraph 139, where it is alleged that:

> "[t]hrough the aforesaid pattern of racketeering activity ... Michael Generoso ... [and the other RICO defendants] have property constituting, and derived from, proceeds which they obtained, directly and indirectly, from racketeering activity in violation of [18 U.S.C. § 1962], thereby making such property, or the amount of cash equivalent thereto, forfeitable to the United States of America."

Paragraph 139 quite adequately alleges that Generoso has forfeitable proceeds. The fact that the specified racketeering counts that gave rise to some of the forfeitable property do not immediately concern Generoso is beside the point. Forfeiture is not sought because of the commission of the predicate acts, it is sought because of the violation of the RICO statute. This count clearly alleges that Generoso has forfeitable assets as a result of a RICO violation.

The motions by Generoso and Schenone to dismiss the forfeiture allegations in the complaint are denied.

*Substitute Assets*

██ Generoso and Schenone next argue that the restraint of substitute assets allowed by the post-indictment restraining order issued by Judge Mukasey in this case is improper, and they ask the Court to vacate the order as it pertains to their assets.

In an order dated September 16, 1996, this Court rejected precisely the same argument by defendants Thomas Cestaro and Anthony Pisapia. It there stated that it regarded the

issue as foreclosed by *United States v. Regan*, 858 F.2d 115 (2d Cir.1988). Generoso and Schenone acknowledge this, but argue that the Court should reconsider its prior decision based upon *United States v. Gigante*, 948 F.Supp. 279 (S.D.N.Y.1996), which came to a different conclusion.

The *Gigante* court read *Regan* as containing no suggestion that the statute permits "forcible pre-trial restraint of substitute assets over the asset-holder's objection." *Id.* at 281. With great respect, this Court is not persuaded. The *Regan* panel viewed a forcible pretrial restraint on all of the assets of Princeton/Newport—which included far more than (a) the interests in Princeton/Newport of the indicted defendants, and (b) any traceable proceeds of their alleged racketeering activity—as within the district court's power, although it went on to express a preference for less extreme measures. 858 F.2d at 120–21. It is true that the restraint was imposed to preserve the value of the defendants' interests in Princeton/Newport, which may well have proved forfeitable, rather than on the theory that Princeton/Newport's entire assets were substitute assets. Nevertheless, if, as Generoso and Schenone argue, the statute simply does not permit pretrial restraint of any assets other than those which themselves are forfeitable pursuant to 18 U.S.C. § 1963(a), the basis for the panel's view of the district court's power is not readily apparent.[19] Moreover, the panel took pains to say that substitute assets should be restrained at least in some circumstances, *id.* at 121, a statement difficult to square with the view that the pretrial restraint of substitute assets is unauthorized.

The Court acknowledges that defendants' arguments, if one were writing on a clean slate, would have force and, indeed, that *Regan* did not address the point at issue here in a parallel factual context. Nevertheless, the logic of *Regan*, in this Court's view, cannot be reconciled with defendants' position. Accordingly, this Court believes defendants' argument is better addressed to the Court of

---

**18.** Identical provisions appear in the superseding indictment at paragraphs 146–48.

**19.** Indeed, the *Regan* panel specifically declined to rest its decision on common law principles,

concluding that the order sought was not in the nature of an injunction, and rested on the RICO statute itself. 858 F.2d at 120.

Appeals, particularly where an erroneous grant of the motion at this level might result in the irremediable dissipation of assets that later may prove forfeitable to the government. The motion therefore is denied.

*Government's Motion for an Anonymous Jury*

■■ The government moves the Court for an anonymous jury. Specifically, it asks the Court to order that:

"(1) the potential jurors on the voir dire panel, and the jurors and alternates selected, not reveal their names, addresses, or places of employment; (2) during trial, the jurors be kept together during recesses and taken to or provided lunch as a group each day by the United States Marshals Service; and (3) at the end of each trial day the jurors be transported together by the United States Marshals Service from the Courthouse to an undisclosed central location, from which they can leave for their respective communities." (Gov.Jury Mem. 1)

While the government points out that many courts in this district have granted such requests, empaneling an anonymous jury nevertheless is a measure that should be taken only with care. Because the Court is satisfied that the special circumstances of this case demonstrate the necessity for such action, and also because it is convinced that any prejudice to the defense can be dealt with through *voir dire* and a proper instruction to the jury, the government's motion is granted.[20]

■■ In the Second Circuit, an anonymous jury:

"may be warranted when the jury needs protection, as when the government has demonstrated a defendant's 'willingness ... to tamper with the judicial process.'" *United States v. Thai,* 29 F.3d 785 (2d Cir.1994) (quoting *United States v. Vario,* 943 F.2d 236, 239 (2d Cir.1991), *cert. denied,* [502 U.S. 1036] 112 S.Ct. 882 [116 L.Ed.2d 786] (1992)).

The *Thai* case makes clear also that extensive pretrial publicity in cases involving allegations of violent conduct may justify empaneling an anonymous jury. *See Thai,* 29 F.3d at 801; *United States v. Paccione,* 949 F.2d 1183, 1192 (2d Cir.1991), *cert. denied,* 505 U.S. 1220, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992).

In *United States v. Aulicino,* 44 F.3d 1102, 1116 (2d Cir.1995), the Second Circuit discussed three factors that a district court should examine when considering a motion for an anonymous jury. The court should look to whether: (1) the charges against the defendants are serious; (2) there is a substantial potential threat of corruption to the judicial process; and, (3) considerable media coverage of the trial is anticipated. These factors all weigh strongly in favor of the government's request. *See United States v. Aulicino,* 44 F.3d 1102, 1116 (2d Cir.1995); *Thai,* 29 F.3d at 801.

*Seriousness of Charges*

The defendants in this case are charged with a plethora of very serious crimes, including murder, conspiracy to murder and extortion. A number of the crimes charged deal with violence or threats of violence to achieve the aims of the charged criminal enterprise, including murder to eliminate suspected co-operators with law enforcement and extortion of money and business opportunities. A number of the defendants face murder charges, conviction on which could carry mandatory life sentences. In addition, all of the defendants face terms of up to 20 years if convicted under the RICO statute in addition to significant penalties for conviction on the numerous alleged substantive violations. As a practical matter, many of the defendants, if convicted, could spend the rest of their lives in prison.

The government's proof of some of the most serious charges appears to be substantial. The government has proffered that at least one witness will testify that defendants Bellomo and Generoso ordered the killing of Ralph Desimone. The government also has recorded evidence showing that defendant

---

**20.** This decision applies only to the trial of the superseding indictment and Barrett and Autuori, and not to the severed trial of the Gambling Defendants. The propriety of an anonymous jury in that case, if sought by the government, will be determined by the judge presiding.

Schenone solicited the murder of Richard Sprague.

Given the seriousness of the charges and the exposure of the defendants to long periods of incarceration, there are significant incentives to attempt to subvert the trial process by threats or violence. Moreover, a jury, unless shielded, well could fear malevolent action by defendants accused of these crimes.

### Threat to Judicial Process

The government has substantial evidence that suggests a threat to the judicial process in this case. A number of instances of obstruction of justice are alleged, including the intimidation of prospective witnesses through threats of violence and the murder of suspected co-operators. Schenone is alleged to have threatened a prospective grand jury witness and displayed a gun in order to keep him from disclosing the truth about criminal activities at the Feast of San Gennaro. Cerami is alleged to have instructed a witness to give false information to a law enforcement officer to conceal the criminal activities being engaged in with respect to the San Gennaro feast. Zacchia is alleged to have instructed another grand jury witness to lie in an attempt to cover up schemes at the feast. Ida allegedly conspired to murder and aided and abetted the murder of Antonio DiLorenzo because he was suspected of co-operating with law enforcement. Bellomo, Generoso, Ida and Ruggiero allegedly conspired to murder and aided and abetted the murder of Ralph Desimone because they suspected that he was co-operating with law enforcement. Finally, it is alleged that Schenone solicited the murder of Richard Sprague because Schenone felt that Sprague was aiding the authorities.

This information is doubly significant. First, it suggests the existence of a real threat to the trial. Second, it raises a substantial risk that the jurors, absent anonymity, will fear reprisal. Hence, the second of the *Aulicino* factors is satisfied.

### Publicity

Judging from the amount of publicity that this case has received to date, the Court is confident in holding that the publicity that the trial is likely to receive militates in favor of granting an anonymous jury. Numerous press reports have appeared with regard to pretrial matters.[21] Given the amount of press coverage that organized crime traditionally has received, the profile of the trial is likely to become higher. Indeed, this case appears to have entered cyberspace, as substantial coverage has appeared on a website dedicated to organized crime. In short, this case has received, and likely will continue to receive, substantial coverage in the media.

■ The defense asserts that granting anonymity would limit their ability to use their preemptory challenges effectively. They argue that:

> "a person's name, place of residence, and occupation are three of the major indices used in selecting jurors. In a name, counsel can usually detect nationality, and sometimes, religious preference. A person's residence is also important. Many neighborhoods have specific characteristics that influence the outlook of the people who live there. A juror's leadership qualities are more often than not learned through the specific type of work that he or she does." (Def.Jury Mem 3)

But defendants overstate their case. The proposed order would not limit inquiry into the occupations of the jurors, only information about their specific places of employment. The defense therefore will have access to the information it seeks on this issue. This Court doubts that a defendant has any legitimate use for knowledge of jurors' religions and nationalities in light of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny. Finally, the motion by the government seeks only to preclude the disclosure of jurors' "addresses." The Court intends to inquire as to the county in which each prospective juror resides. Moreover, the defense will have ample opportunity to suggest areas of inquiry

---

**21.** In a pretrial submission, the defense bemoaned the press coverage that a released grand jury photo of defendant Bellomo had received and referred to numerous articles discussing his alleged place in the Genovese crime family.

for *voir dire*. Thus, the defense should have no problem in assessing the possible bias of prospective jurors.

Finally, the Court will present a neutral explanation to the jury for their anonymous status that will seek to preclude any negative inferences against the defendants. Such an instruction will adequately protect the defendants from prejudice. *See United States .v. Thai,* 29 F.3d 785, 801 (2d Cir.1994); *United States v. Paccione,* 949 F.2d 1183, 1193 (2d Cir.1991), *cert. denied,* 505 U.S. 1220, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992); *United States v. Tutino,* 883 F.2d 1125, 1133 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 1082, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990).

The government's motion for an anonymous jury is granted. .

### Conclusion

All of the defendants' pretrial motions, to the extent not previously resolved, are denied except that the severance motions by defendants Saggese, Romano, James Pisacano and Joseph Pisacano are granted to the extent described above. The trial of defendants Saggese, Romano, James Pisacano, Joseph Pisacano, Setford, and Batista on the original indictment is severed and assigned to Honorable Robert J. Ward with his consent. The trials of the remaining defendants on the original and superseding indictments in this case are joined under FED.R.CRIM.P. 13. Trial will commence in the ceremonial courtroom on February 3, 1997 at 9:30 a.m., as previously scheduled. An anonymous jury will be empaneled.

SO ORDERED.