**UNITED STATES of America**

v.

**David PAPPAS**

**No. CRIM.3:02 CV 191(CFD).**

United States District Court,
D. Connecticut.

Jan. 5, 2004.

David J. Wenc, Waterside Office Park, Windsor Locks, CT, for Defendant.

John H. Durham, Michael J. Gustafson, Peter D. Markle, U.S. Attorney's Office–NH, New Haven, CT, Raymond F. Miller, U.S. Attorney's Office–HFD, Hartford, CT, for Plaintiff.

## RULING ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

COVELLO, District Judge.

The defendant, David Pappas, was indicted for conspiracy to possess with intent to distribute, and to distribute, 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), and 846. Pappas was indicted with 19 others for their alleged connection to a wide-spread cocaine trafficking conspiracy that was active in 2001 and 2002 in the Meriden, Connecticut area and was supplied by a Mexican Drug Trafficking Organization ("MDTO") through Phoenix, Arizona.[1] The following co-defendants have pled guilty and have been sentenced or await sentencing: Samuel Virella, Jose Refugio Romero–Machado, Jose Luis Romero–Machado, Marin Felipe Zamudio–Gastelum, Adrian Tapia, Mario Quinterro, Jesus Perez, Abraham LaPorte, Jessica Acevedo, Efrain Rosario, Rudy Smith, Jeffrey Johnson, Jonathan Casillas, Travis Auala, and Miguel Valentine. Pappas and three other defendants await trial.

The investigation into the conspiracy was conducted by a task force comprised of FBI and DEA agents, Connecticut state troopers, and municipal police officers. The investigation included court-authorized wiretaps on two telephones. Pending before the Court is Pappas's Motion to Suppress Evidence [Doc. # 213].[2] The motion seeks suppression of evidence obtained through wiretaps conducted on the telephones of co-defendants Samuel Virella ("Target Telephone I")[3] and Jose Refugio Romero–Machado ("Target Telephone II") on the bases that (1) the Government did not make a sufficient showing that conventional investigative techniques had been tried and failed, or were otherwise unlikely to succeed, and (2) the Government omitted material facts from its affidavits in support of the two wiretaps that, had they been included, would have precluded the

---

1. Count One of the Indictment alleges a conspiracy against certain of the defendants; Counts Two through Eighteen are "sale" or "telephone" counts against certain of the defendants; and Count Nineteen seeks forfeiture of certain property as to certain of the defendants. Pappas is named as a defendant in Counts One and Nineteen, the conspiracy and forfeiture counts.

2. None of the remaining defendants has joined Pappas in this motion.

3. Pappas was not named as a violator or interceptee in the Target Telephone I application, nor was he intercepted in any of the calls on that telephone. Rather, Pappas was named as an interceptee in the application for Target Telephone II, and he was intercepted in conversations that occurred over Target Telephone II. It is undisputed, however, that the probable cause that justified the court's authorization for the interception of communications occurring over Target Telephone II was provided, in substantial part, by conversations intercepted on Target Telephone I. In addition, the affidavit dated May 30, 2002 in support of the application for Target Telephone II explicitly incorporated the affidavit dated May 8, 2002 in support of the application for Target Telephone I.

court's order authorizing the interception of wire communications because of a failure to meet the required showing of a failure of conventional investigative techniques.[4] An evidentiary hearing was held on the motion to suppress evidence. For the following reasons, the motion is DENIED.

## I. Background

In the course of the Task Force's investigation, the Government made two applications to the District Court for authorization to intercept certain wire communications. The first application, made on May 8, 2002, sought permission to intercept wire communications occurring over telephone number (203) 440–1197, subscribed to in the name of Kelly Pierce and located at 525 Crown Street, Meriden, Connecticut, which was the home of Samuel Virella. In its application, the Government identified that the wiretap intercept was expected to reveal: (1) the nature, locations, extent and methods of the narcotics trafficking business and operation of the named "Violators" and others yet unknown; (2) the identities and roles of their accomplices, aiders and abettors, co-conspirators and participants in their illegal activities; (3) the distribution and transfer of the contraband and money involved in those activities; (4) the existence and locations of records relevant to those illegal activities; (5) the existence, locations and sources of resources used to finance those illegal activities; (6) the locations and disposition of proceeds from those illegal activities; and (7) the locations of items used in furtherance of those activities.

In support of its wiretap application, the Government submitted the affidavit of FBI Special Agent Eric S. Grunder. In his affidavit, Special Agent Grunder detailed information that had been gathered about the narcotics-trafficking activity of Virella and his co-conspirators, and set forth information that the agent concluded constituted probable cause to believe that the violators were involved in the illegal activity, that the anticipated interceptees were using the target facility in connection with that activity, and that intercepted communications occurring over that facility would constitute evidence of that activity.

In a 10–page, 16–paragraph section of the affidavit (pages 33–44), Special Agent Grunder set forth the basis for his conclusion that normal investigative procedures would be inadequate or unlikely to achieve the objectives of the investigation, and that electronic surveillance, would, in his view, be necessary. Grunder specifically discussed in this section the use and limitations of physical surveillance, the grand jury, cooperating sources, undercover officers, subject interviews, search warrants, pen register and toll data, and consensually monitored meetings. With respect to each of these categories of conventional investigative methods, Special Agent Grunder acknowledged their successful, if limited, use in the investigation, and provided details as to why each was unlikely

---

4. Pappas raised an additional argument at the hearing on the Motion to Suppress that the Government lacked probable cause to name David Pappas as an interceptee in the wiretap application for Target Telephone II. However, he did not assert this argument in any of the documents submitted to the Court. Also, the Government is not required to establish probable cause as to every named Interceptee in a wiretap application. "The focus of the proba-

ble cause determination under Title III is on the facility of communication, and on the person primarily in control of that facility. A finding of probable cause as to every other potential interceptee, however, is not required under Title III." *United States v. Segura*, 2001 WL 286850, *12 (D.Conn.2001) (citing *United States v. Figueroa*, 757 F.2d 466, 475 (2d Cir.1985)); *see also United States v. Bellomo*, 954 F.Supp. 630, 640–41 (S.D.N.Y.1997).

to result in the attainment of the objectives of the investigation.

The May 8, 2002 application was granted by then Chief Judge Alfred V. Covello and interceptions were initiated immediately and continued until Virella terminated service on his home telephone on May 18, 2002.

Subsequently, on May 30, 2002, the Government made an application for authorization to intercept wire communications occurring over telephone number (203) 507–4501, subscribed to by Francisco Montanez, 131 Crown Street, Apartment 1, Meriden, Connecticut, and used by Jose Refugio Romero–Machado. In support of its application, the Government submitted the affidavit of FBI Special Agent Mark Gentil. In his affidavit, Special Agent Gentil explicitly referenced and incorporated Special Agent Grunder's affidavit dated May 8, 2002.[5] Special Agent Gentil's affidavit identified what the wiretap intercepts were expected to reveal and detailed information that had been gathered to establish the existence of probable cause to support the issuance of an order authorizing the interception of wire communications on the Romero–Machado phone. Special Agent Gentil also explained that while normal investigative procedures had been and would continue to be employed in the investigation, wiretap intercepts were the only investigative technique available with a reasonable likelihood of securing the evidence necessary to prove that the violators as denominated in that affidavit were involved in the illegal activity. Special Agent Gentil discussed the use and limitations of physical surveillance, federal grand jury subpoenas, confidential informants and cooperating witnesses, undercover police officers and agents, subject interviews, search warrants, pen registers/telephone tolls, and consensually monitored conversations and meetings.

The May 30, 2002 application was granted by Chief Judge Covello and interceptions were initiated immediately.

## II. Legal Standard

■ The procedure for securing judicial authority to intercept oral communications is governed by 18 U.S.C. § 2518. More specifically, § 2518(1)(c) provides that any application for authorization to intercept electronic communications must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* Similarly, § 2518(3)(c) requires that, as a condition of authorizing the wiretap, the reviewing judge find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* This "necessity" requirement is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974).

■■ However, these statutory conditions are "far from an insurmountable hurdle," and require only that the Government demonstrate "that normal investigative techniques would prove difficult ... [and not] that any other option would be doomed to failure." *United States v. Bellomo,* 954 F.Supp. 630, 638–39 (S.D.N.Y. 1997). Title III does not demand that every other conventional method of investigation be attempted unsuccessfully before electronic surveillance may be authorized. *United States v. Young,* 822 F.2d

5. *See* 5/30/02 Affidavit at ¶ 5.

1234, 1237 (2d Cir.1987); *United States v. Lilla*, 699 F.2d 99, 104 (2d Cir.1983).

 In addition, the sufficiency of a wiretap application must be reviewed in a "practical and common sense manner and need be only minimally adequate to support the issuing judge's determination of necessity," *United States v. Trippe*, 171 F.Supp.2d 230, 236 (S.D.N.Y.2001) (citing *United States v. Torres*, 901 F.2d 205, 232 (2d Cir.1990)), and the issuing judge's determination is entitled to substantial deference. *Torres*, 901 F.2d at 231; *United States v. Wilkinson*, 754 F.2d 1427, 1433 (2d Cir.1985); *Bellomo*, 954 F.Supp. at 639.

 A defendant may also challenge a warrant affidavit on the basis that there were material omissions in the affidavit. *Franks v. Delaware*, 438 U.S. 154, 164–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In order to invoke the *Franks* doctrine, a defendant bears the burden of proving that there were intentional and material misrepresentations or omissions in the warrant affidavit. *U.S. v. Awadallah*, 349 F.3d 42, 64 (2d Cir.2003). A defendant must show that the affiant knowingly and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in his application for a warrant, and that such statements or omissions were necessary to the finding of probable cause. *Golino v. City of New Haven*, 950 F.2d 864, 870–71 (2d Cir.1991), *cert. denied*, 505 U.S. 1221, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992); *Franks*, 438 U.S. at 171–72, 98 S.Ct. 2674; *see also Awadallah*, 349 F.3d at 64; *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir.2000). "Recklessness may be inferred where the omitted information was 'clearly critical' to

the probable cause determination." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir.1991).

### III. A. Necessity Requirement

Pappas argues that the Government did not make a sufficient showing that conventional investigative techniques had been tried and failed, or were otherwise unlikely to succeed. However, the affidavits of both Special Agent Grunder and Special Agent Gentil fully and adequately outlined the extent of the Government's investigative steps, the results of those efforts, and the need for electronic surveillance. Each of the two applications will be considered as to that requirement.

#### 1. Wiretap on Target Telephone I

##### a. Physical review of the Arizona FBI and DEA case file concerning the MDTO.

 Pappas first contends that Special Agent Grunder's failure to set forth in his affidavit that he did not physically review the Arizona DEA and FBI files on the Arrelano–Felix organization, a drug trafficking organization with locations in Mexico, Phoenix, Albuquerque, Denver and San Diego, establishes that the Government failed to meet the necessity requirement. Apparently, his claim is that a review of these files would have produced such information that would have made the wiretap unnecessary. In his affidavit, however, Special Agent Grunder stated that "Task Force members met with CI–3 [6], a source of information developed by the Arizona DEA in approximately February 2001." 5/8/02 Affidavit at ¶ 13. Special Agent Grunder also wrote that "I have also learned that in February 2001 the DEA in

---

**6.** "CT" is an abbreviation for a "confidential informant": a non-testifying individual who provides information to law enforcement officials on the condition that his identity not be divulged.

Arizona spoke to CI–3, who provided detailed, first-hand information about large shipments of cash (approximately $40,000 per shipment) from Meriden, Connecticut to Phoenix, Arizona, and large shipments of cocaine from Phoenix to Meriden." 5/8/02 Affidavit at ¶ 26. Further, he stated that "Task Force Agent (TFA) Grady and myself spoke to CI–3 in April 2002 and **confirmed the information previously provided to the DEA.**" 5/8/02 Affidavit at ¶ 27 (Emphasis added).

Special Agent Grunder was entitled to rely on his interviews of the confidential informant and the Arizona agents to determine whether any further investigative steps, such as physically reviewing the DEA's and FBI's files on the Arrelano–Felix organization for a Connecticut link other than that already developed, needed to be taken. Further, in light of the interviews of CI–3 and the discussions with Arizona DEA, the failure to review the files does not represent a failure to satisfy the necessity requirement as the substance of the confidential informant's information and the DEA information concerning the source of supply was sufficient; the essential information concerning the Arrelano–Felix organization and its ties to Connecticut was conveyed to Grunder and Grady and was recounted in the affidavit. The affidavit's disclosure of the contacts with CI–3 and the federal agents in Arizona was also sufficient to satisfy the necessity requirement as part of Chief Judge Covello's review.

### b. Interview of the drug couriers with ties between Meriden and Phoenix.

Pappas also asserts that the Government failed to meet the necessity requirement because the Task Force had identified Margarito Fidel and Jorge Bustillos as two couriers involved in trafficking between Phoenix and Meriden, but did not interview them. Apparently, the claim is that, had they been interviewed, their information would have obviated the need for the wiretap.

■ However, the Task Force did, in fact, attempt to interview both, and one agreed. In his affidavit, Special Agent Grunder describes interviews with numerous cooperating witnesses and confidential informants, including CI–3, identified as a source developed by the Arizona DEA. Special Agent Grunder stated that CI–3 "provided detailed, first-hand information about large shipments of cash (approximately $40,000 per shipment) from Meriden, Connecticut to Phoenix, Arizona, and large shipments of cocaine from Phoenix to Meriden." 5/8/02 Affidavit at ¶ 26. In addition, he described how he and Task Force Agent Grady "spoke to CI–3 in April 2002 and confirmed the information previously provided to the DEA." 5/8/02 Affidavit at ¶ 27. He detailed the information he and Agent Grady learned from CI–3. 5/8/02 Affidavit at ¶¶ 26–9.

Agent Grunder shielded the individual's identity by referring to the person as CI–3 in the affidavit. While Chief Judge Covello may not have known the name of CI–3, Special Agent Grunder described the information he received from CI–3 regarding several of the drug traffickers believed to have been operating in the central Connecticut area. As mentioned in Part B of this opinion, CI–3 was Fidel or Bustillos. Thus, even though Grunder failed to identify Fidel or Bustillos as CI–3 in the affidavit, the important information was obtained, recited in the affidavit, and the specific name of CI–3 was not important as to probable cause or necessity.

### c. The continued use of physical surveillance.

■ Pappas claims that the Task Force was able to and did conduct physical

surveillance prior to and during the wiretap, which the Government does not dispute. He argues, though, that the Government's effective use of this investigative tool establishes that the Government failed to satisfy the necessity requirement.

Special Agent Grunder stated in his affidavit that the Task Force had used traditional investigative methods such as physical surveillance during the investigation and that such tools "will continue to be employed in this investigation[.]" 5/8/02 Affidavit at ¶ 67. Special Agent Grunder also explained that the utility of physical surveillance was limited:

> Even if highly successful, physical surveillance is not always effective in gathering evidence of the criminal activity under investigation. It is an investigative technique used to confirm meetings between alleged conspirators, and often leads investigators to make educated deductions as to the purpose of the meetings. It is also a technique used to corroborate information obtained from informants and cooperating witnesses. Physical surveillance typically will not establish conclusively the elements of the subject violations, however, and, in this case it most likely will not establish conclusively the identities of all of the various conspirators. Prolonged or regular physical surveillance of the targets would most likely be noticed, causing them to become more cautious in their illegal activities, to flee to avoid further investigation and prosecution, to cause a threat to the safety of the cooperating witnesses and agents and officers, or otherwise to compromise the investigation.

> \* \* \* \* \* \*

> Furthermore, physical surveillance will not fully identify and provide admissible evidence against the higher ranking members of the organization since they tend not to be involved in the actual day-to-day distribution of narcotics to ultimate purchasers.

> \* \* \* \* \* \*

> Physical surveillance has been attempted on numerous occasions during the course of this investigation. Although it has proven valuable in identifying some of the Violators' activities, their associates, their residences, as well as the location of certain of their narcotics distribution operations, physical surveillance, if not used in conjunction with other techniques, including electronic surveillance, is of limited value.

See 5/8/02 Affidavit at ¶¶ 68, 70–71. Special Agent Grunder also discussed specific instances of surveillance that proved difficult. See 5/8/02 Affidavit at ¶¶ 68–70. In short, Agent Grunder carefully explained to Chief Judge Covello the usefulness and the limitations of physical surveillance—both generally and more particularly as it applied to the subject investigation, as well as the Task Force's intention to continue to use that tool. The limitations of physical surveillance in this investigation, as recounted in Grunder's affidavit, establish that the continued use of physical surveillance does not represent a failure to satisfy the necessity requirement.

**d. The continued use of undercover witnesses and consensual recordings.**

Pappas also argues that the May 8 affidavit created the impression that the use of undercover agents and consensual recordings was insufficient, but that Special Agent Grunder had in fact used these tools effectively until he stopped prematurely, and that Agent Grunder inappropriately abandoned these investigative tools. Pappas contends that the Government failed to satisfy the necessity requirement when it

abandoned its use of undercover witnesses and consensual recordings.

 Agent Grunder's affidavit outlined in great detail the instances when cooperating witnesses—often wearing recording devices—and an undercover officer purchased cocaine and cocaine base from Virella and/or his alleged co-conspirators between January 29 and March 26, 2002. *See* 5/8/02 Affidavit at ¶¶ 31–58. This portion of the affidavit also detailed the statements Virella made about his Mexican suppliers to the cooperating witnesses, supporting probable cause to believe that Virella was a large-scale drug dealer being supplied multiple kilograms of cocaine on a weekly basis by a MDTO.

The Task Force's objective, however, was to capture the full extent of Virella's Meriden-based operation, to identify more accurately Virella's Mexican sources of supply, and to locate the extensive proceeds that the conspiracy generated. *See* 5/8/02 Affidavit at ¶¶ 8 & 9. With these objectives in mind, Agent Grunder turned to a discussion of why the use of confidential informants, cooperating witnesses, undercover officers and consensual recordings would not allow the Task Force to attain its ultimate goal of dismantling the larger organization that was supplying Virella.

The affidavit also makes clear that cooperating witnesses would continue to be employed: "As noted above, reliable cooperating witnesses and confidential informants have been developed and used, and will continue to be developed and used, in this investigation." 5/8/02 Affidavit at ¶ 76. Agent Grunder then provided Chief Judge Covello with specific reasons as to why the investigation would not advance if the Task Force simply continued to rely on the use of cooperating witnesses making consensually recorded conversations with Virella:

However, none of the sources developed have sufficient knowledge of the workings and organization of the MDTO that supplies Virella. CW–2 has knowledge of Virella's organization but little information about the Mexicans that supply Virella. For example, Virella has not allowed CW–2 to participate in meetings with his Mexican suppliers. Similarly, while CI–3 has provided information to law enforcement officials about several of the Mexican drug traffickers believed to have been operating in the central Connecticut area, *see* paragraphs 26–29, he/she is not currently involved in the MDTO nor has he/she been involved in over one year and, moreover, never had thorough knowledge of the organization's inner workings.

\* \* \* \* \* \*

None of the confidential informants described in this affidavit are able to furnish information that would identify fully all members of this ongoing conspiracy, define the current roles of those conspirators sufficiently for prosecution, or sufficiently identify the source of supply of drugs or all details of delivery, quantities, or financial arrangements of the drug operation. Additionally, Virella's cocaine is brought to Connecticut on an unknown schedule and by an unknown route. None of the informants/cooperating witnesses utilized in this investigation have been able to advise law enforcement with particularity as to the time and/or location of cocaine shipments to Virella; rather, the best information received to date is simply that Virella is expecting to obtain cocaine from his supplier.

\* \* \* \* \* \*

I believe that information provided by the confidential sources, even if all sources agreed to testify, would not,

without the corroborative evidence available through the requested surveillance, result in a successful prosecution of all the participants.

*See* 5/8/02 Affidavit at ¶¶ 76–78. Agent Grunder explained to Chief Judge Covello what Pappas claims the Government ignored:

The consensual monitoring of telephone conversations and meetings has been employed in this investigation. However, even when highly successful, consensual monitoring of telephone conversations and meetings is not always effective in gathering evidence of the criminal activity of the type under investigation. The success of consensual monitoring in gathering evidence necessary to meet the objectives set forth above is limited by the extent to which cooperating witnesses and undercover police officers have been successfully employed. In this regard, such monitoring is most successfully employed in the narrow circumstances when a confidential witness has been introduced and has been able to develop a rapport with a target of the investigation. In any event, consensual monitoring of telephone conversations and meetings would not result in the development of evidence concerning the identities of all the organization's members and associates, customers, sources of supply, residences, or telephone facilities utilized by the organization.

*See* 5/8/02 Affidavit at ¶ 78.

In his affidavit, Agent Grunder adequately explained that undercover witnesses and consensual recordings had been used and would continue to be used in the investigation. He also pointed out the limitations of such investigative tools, particu-

larly in light of the Task Force's objectives.

**e. Physical review of the Meriden Police Department's file on Virella's arrest for being involved in a "shoot-out."**

■ Pappas also asserts that Chief Judge Covello was misled into authorizing the wiretap on Target Telephone I by virtue of the Government's failure to review the Meriden Police Department's file relative to a shooting at the Residence Inn in Meriden in January 2000. More specifically, Pappas claims that Grunder created the impression in his affidavit that the Task Force was not aware of Virella's drug trafficking activities during 2000; if he had reviewed the Meriden files on the shoot-out, he would have learned of such involvement and would have disclosed it in his affidavit, Pappas maintains. More knowledge of Virella's drug history would have made the wiretap unnecessary, Pappas apparently claims.

In his affidavit, Agent Grunder discussed the Task Force's investigation of the "shoot-out" and its connection to Virella's drug trafficking:

In October 2000 the Task Force was investigating a Meriden crack cocaine dealer named Miguel Estrella. During the course of the investigation one of Estrella's associates, Robert Marrow,[7] was arrested in connection with the kidnaping (sic) of two Dominican drug traffickers. Members of the Task Force interviewed Marrow, who confessed to his involvement in the kidnaping and also told law enforcement about a Janu-

---

7. Marrow is spelled "Merrill" in the transcript of the hearing on the Motion to Suppress.

ary 2000 "shootout" that occurred at the Residence Inn in Meriden, Connecticut.

\* \* \* \* \* \*

More specifically, Marrow said that Sammy Virella, who Marrow knew as "Paco," sold drugs in Meriden and New Haven and that Paco had asked Estrella to travel to Arizona with him to obtain eight kilograms of cocaine. According to Marrow, Estrella feigned interest in becoming partners with Paco while he actually planned to rob and kill Paco. In that regard, Marrow stated that in early 2000 several men attempted to rob Paco's workers, including Pedro Montalvo, while they were converting cocaine powder into crack cocaine at the Residence Inn in Meriden. Marrow further stated that Paco arrived at the Residence Inn moments before the robbery and that a shootout ensued. Marrow also stated that Paco was shot in the shoulder but managed to escape, driving to New York where he received medical attention under a false name. *I have confirmed with the Meriden Police Department that, on January 8, 2000, members of that department investigated a report of a shooting at he Residence Inn.*

\* \* \* \* \* \*

*Shortly after receiving this information from Marrow members of the Task Force contacted detectives of the Meriden Police Department, who confirmed that Sammy Virella is a known drug trafficker also known as "Paco." According to the Meriden Police Department's narcotics detectives,* Virella had a group of younger men that sold crack cocaine for him from the Silver Ridge Apartment complex on Old Colony Road, Meriden, Connecticut. Included among Virella's young associates were "Travis" (subsequently identified as Travis Auala) and the Ojeda brothers (later deter-

mined to be Frankie, Johnny and Vincente, a.k.a. Vinny and/or Ricky).

5/8/02 Affidavit at ¶¶ 19–21 (emphasis supplied).

Special Agent Grunder, in speaking with Meriden's Narcotics Detectives, obtained the essence of the investigative knowledge the department possessed relative to Virella's drug trafficking and its relation to the shootout. Paragraphs 20 and 21 of the affidavit contain the information that would have been found in the written reports. The failure to physically review the file does not represent a failure to satisfy the necessity requirement in light of the disclosures in the affidavit.

### 2. Wiretap on Target Telephone II

Pappas also argues that the Government failed to satisfy the necessity requirement in its application for a wiretap on Target Telephone II. In particular, Pappas contends that (1) the Government failed to establish that the use of cooperating witnesses and confidential informants failed or reasonably appeared unlikely to succeed; and (2) the Government failed to establish that the use of other traditional techniques of law enforcement failed or reasonably appeared unlikely to succeed.

In his affidavit, Special Agent Gentil stated that:

The interception of wire communications occurring over the Target Telephone is the only investigative technique available at this time with a reasonable likelihood of securing the evidence necessary to prove beyond a reasonable doubt that the Violators, and others as yet unknown, are engaged in the above described offenses, and of securing evidence regarding the scope of their activity, the structure of their organization, their sources of supply for cocaine, the locations at which they process cocaine

powder into cocaine base and package it for distribution, the locations at which their narcotics and proceeds are kept, and the means by which their distribution activity is carried out.

5/30/02 Affidavit at ¶ 42. Agent Gentil then provided specific reasons as to the limited utility of traditional investigative methods in this investigation.

### a. Cooperating Witnesses & Confidential Informants

Pappas first argues as to the second wiretap that the Government's failure to continue to use cooperating witnesses and confidential informants represents a failure to satisfy the necessity requirement, particularly in light of the information the Government was able to learn from cooperating witnesses and confidential informants prior to seeking that wiretap.

In his affidavit, Special Agent Gentil explicitly incorporated Special Agent Grunder's affidavit dated 5/8/02. Special Agent Gentil stated that "[b]ecause the information obtained from cooperating witnesses ("CW") and confidential informants ("CT") was previously outlined in the attached affidavit of May 8, 2002, I will not repeat the information herein." 5/30/02 Affidavit at ¶ 10. Agent Gentil's affidavit then detailed many of the instances when cooperating witnesses and confidential informants were useful to the investigation. 5/30/02 Affidavit at ¶¶ 14–39. However, he also set forth their limitations:

As noted above, reliable cooperating witnesses and confidential informants have been developed and used, and will continue to be developed and used, in this investigation. However, none of the sources developed have sufficient knowledge of the workings and organization of the MDTO that supplies Virella. CW–2 and CW–3 have knowledge of Virella's organization but little information about the Mexicans that supply Virella. CI–3 has information about the identity of some of the members of the MDTO. However, CI–3 has had little or not contact with members of the MDTO for over a year and never had thorough knowledge of the organization's inner workings.

None of the confidential informants described in this affidavit is able to furnish information that would identify fully all members of this ongoing conspiracy, define the current roles of those conspirators sufficiently for prosecution, or sufficiently identify the source of supply of drugs or all details of delivery, quantities, or financial arrangements of the drug operation. Additionally, Virella's cocaine is brought to Connecticut by unknown parties and none of the CI's or CW's that have been developed are able to provide any information concerning the identities of these persons or methods of operation.

I believe that information provided by the confidential sources, even if all sources agreed to testify, would not, without the corroborative evidence available through the requested surveillance, result in a successful prosecution of all the participants.

5/30/02 Affidavit at ¶¶ 48–50. Agents Grunder and Gentil not only made clear that cooperating witnesses and confidential informants would continue to be employed, but also provided Chief Judge Covello with specific reasons regarding why these investigative tools were insufficient. Thus, the Government did not fail to satisfy the necessity requirement in this regard.

### b. Pen Registers and Toll Records

■ Pappas also argues that the Government's failure to continue the use of pen registers and toll records represents a failure to satisfy the necessity requirement.

In his affidavit, Agent Gentil stated that "traditional investigative methods have been, and will continue to be employed in this investigation, and they have enabled the Task Force to develop substantial and significant information about the criminal activity of the Violators." 5/30/02 Affidavit at ¶ 42. Agent Gentil specifically detailed the information gained from the use of pen registers and toll records. 5/30/02 Affidavit at ¶¶ 40–1. Agent Gentil then explained the limited utility of pen registers and toll records:

> Telephone toll information has been used in this investigation. While telephone toll information has proven useful in showing probable usage of particular telephones in narcotics-related conversations, the telephone toll information only shows that particular calls were made. The same is true of pen register information, which has also been used in this investigation. In short, neither telephone toll nor pen register information reveal whether conversations took place, the subjects, if any, discussed, or the identities of the actual participants in any such conversations.

5/30/02 Affidavit at ¶ 55. Agent Gentil's affidavit adequately explained that while pen registers and toll records had been used and would continue to be used in the investigation, such investigative tools were of limited utility.

#### c. Physical Surveillance

Pappas also contends that the Government's success in the use of physical surveillance after May 8, 2002 (the date of the authorization for the wiretap on Target Telephone I) establishes that the Government failed to satisfy the necessity requirement in its application for the wiretap on Target Telephone II.

In his affidavit, Agent Gentil explained the usefulness and the limitations of physi-cal surveillance. As it applied to the subject investigation, he stated:

> In particular, Virella meets with his Mexican drug suppliers at 183 Quinnipiac Street, Wallingford, Connecticut. The entrance used by Virella and the Mexicans is shielded on one side by a fence and in order to surveil the residence, officers must park on a residential street near the subject house. An unknown vehicle parked in such a location for any length of time is sure to attract attention. Additionally, during one such surveillance, Officer John Testa drove by Virella as he exited 183 Quinnipiac. Virella observed Officer Testa closely. It is almost certain that Virella was trying to determine if Testa was a law enforcement officer. In sum, though physical surveillance is somewhat effective, its uses are limited and prolonged surveillance risks revealing the investigation which leads to its compromise. Further, attempts to surveil the Mexicans have shown them to be surveillance conscious. During a surveillance of a man believed to be Jose Romero, the surveilled vehicle drove into and through a K-mart parking lot, coming right back out a separate exit. As he exited, the driver took a long look at the other vehicles moving in the lot. The surveillance had to be canceled.

5/30/02 Affidavit at ¶ 43. In addition, Agent Gentil pointed out that "physical surveillance will not fully identify and provide admissible evidence against the higher ranking members of the organization." 5/30/02 Affidavit at ¶ 44. Agent Gentil concluded that although physical surveillance "has proven valuable in identifying some of the Violators' activities, their associates, their residences, as well as the location of certain of their narcotics distribution operations, physical surveillance, if not used in conjunction with other techniques,

including electronic surveillance, is of limited value." 5/30/02 Affidavit at ¶ 45.

In short, the affidavit adequately explained that further use of physical surveillance, if not combined with the interception of wire communications, would prevent law enforcement from learning the full scope of the organization. Traditional investigative techniques alone would not suffice. Thus, the Government has not failed to satisfy the necessity requirement on that basis either.

## B. Material Omissions

Pappas also asserts that the Government omitted material facts from the affidavits that, had they been included, would have precluded the court's orders authorizing the interception of wire communications on the basis that the Government failed to satisfy the necessity requirement. As previously mentioned, Pappas appears to mount a challenge pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Without deciding whether a *Franks* challenge can be asserted for failure to satisfy the necessity requirement, the Court makes the following findings of fact and conclusions of law on the assumption that such a *Franks* challenge is allowed.[8]

### 1. Findings of Fact

The Court makes the following findings of fact based on the evidence presented at the hearing on the motion to suppress evidence:

---

**8.** To warrant a Franks hearing, Pappas must make a "substantial preliminary showing" that there were intentional and material misrepresentations or omissions in the warrant affidavits. *Franks*, 438 U.S. at 171–72, 98 S.Ct. 2674. Although the Government objected at the hearing on the motion to suppress to either Special Agent Grunder or Special Agent Gentil testifying, it was not clear that

### a. Link Between Meriden and Phoenix

 Special Agent Grunder and Detective Charles Grady traveled to Arizona in March 2002 after learning that the DEA had an informant there who possessed information about Samuel Virella. In Arizona, Agent Grunder and Detective Grady met with FBI and DEA agents to discuss a Connecticut link to the Arrelano–Felix drug trafficking organization, which operated between Mexico and Phoenix, Arizona. At the invitation of the Arizona law enforcement officials, Agent Grunder and Detective Grady approached Margarito Fidel and Jorge Bustillos, one of whom agreed to be debriefed. Fidel and Bustillos had operated as drug couriers between Phoenix and Meriden. Agent Grunder shielded the individual's identity by referring to the person as CI–3 in his 5/8/02 affidavit. While in Phoenix, Agent Grunder and Detective Grady interviewed CI–3, who identified a photograph of Mr. Virella as one of the persons that was buying cocaine from "the Mexicans," apparently the Arrelano–Felix organization. The sum and substance of this investigative effort was to confirm that Virella was a major drug trafficker being supplied by Mexicans with ties to the Phoenix area.

### b. The continued use of physical surveillance.

The Task Force used physical surveillance throughout the investigation, including the period between March 27, 2002 and May 8, 2002.

---

the basis for the objection was the *Franks* requirement of the "substantial preliminary showing." Although Special Agent Grunder testified at the hearing, the Court did not—and does not—find that the "substantial preliminary showing" was made. Notwithstanding, the Court addresses the *Franks* claims.

**c. Physical review of the Meriden Police Department's file on Virella's arrest for being involved in a "shoot-out."**

The Task Force investigated the shooting at the Residence Inn in Meriden, Connecticut, which had occurred in January 2000 and its connection to Samuel Virella's drug trafficking. Specifically, during the course of an investigation into a Meriden crack dealer named Miguel Estrella in October 2000, an arrestee named Robert Marrow told the Task Force about the January 2000 shoot-out involving Virella. The Task Force then contacted the Meriden Police Department to confirm this information. The Task Force did not physically review the police department file concerning Virella. However, in speaking with Meriden's Narcotics Detectives, the Task Force obtained the substance of the historical and institutional knowledge the department possessed relative to Virella's drug trafficking, which led to the shooting.

**2. Conclusions of Law**

In his motion to suppress evidence, Pappas argues that the Government omitted the following material facts from the 5/8/02 affidavit:

**a. Physical review of the Arizona FBI and DEA case file concerning the MDTO.**

Pappas apparently contends that Special Agent Grunder's failure to disclose in his affidavit the fact that he did not physically review the Arizona DEA's and FBI's files on the Arrelano–Felix organization or the names of Fidel or Bustillos constitutes a material omission. In his affidavit, Agent Grunder described the Task Force's efforts with the DEA in Arizona.[9] In addition, at the suppression hearing, Agent

Grunder testified that as part of the FBI's investigation into Samuel Virella's cocaine distribution operation and its possible connections to a MDTO located in the Southwest, he and Detective Charles Grady traveled to Arizona in March 2002 after learning that the DEA had an informant who possessed information about Samuel Virella. *See* August 18, 2003 Transcript at pages 19–20, 33–34 ("Tr. at p. ——"). There, the two met with agents of the FBI and DEA, debriefed the DEA informant, and examined photographs of suspected drug traffickers with possible connections to Connecticut. The informant identified Virella as a purchaser of large quantities of cocaine from the MDTO. *See* Tr. at pp. 33–34. Based on the information provided in the affidavit and the testimony at the suppression hearing, none of the omitted information to which Pappas points was critical to the probable cause determination. In addition, the inclusion of this information in the affidavit would not have precluded a finding that the Government satisfied the necessity requirement. The gist of the information provided by the Arizona federal agents, as well as the confidential informant in Phoenix, was adequate.

**b. The drug couriers with ties between Meriden and Phoenix.**

As mentioned, Pappas asserts that Special Agent Grunder's failure to name Margarito Fidel and Jorge Bustillos, two couriers involved in trafficking between Phoenix and Meriden, in his affidavit constituted a material omission.

 As stated above, at the invitation of the Arizona law enforcement officials, Agent Grunder and Detective Grady approached Margarito Fidel and Jorge Bustillos in Phoenix, and one agreed to be

---

9. *See infra* pp. 256–57.

debriefed. Agent Grunder shielded the individual's identity in the affidavit, however, by referring to the person as CI–3. As Special Agent Grunder did interview CI–3 and disclosed this information in the affidavit, there was no material omission.[10] Nor does the failure to mention Fidel and Bustillos by name constitute a material omission. Their names were not critical to the probable cause determination, nor would the inclusion of their names have precluded a finding that the Government satisfied the necessity requirement.

### c. The continued use of physical surveillance.

Pappas also argues that the Task Force improperly created the impression that it had abandoned physical surveillance after March 27, 2002. Pappas also contends that the failure to reveal the instances of physical surveillance between March 27, 2002 and May 8, 2002 understated the potential utility of standard physical surveillance techniques in this investigation.

■■■ The Government agrees that the Task Force continued to employ this investigative method after March 27, 2002. In his affidavit, though, Special Agent Grunder affirmatively explained to Chief Judge Covello that the Task Force had used physical surveillance during the investigation and that such tools "will continue to be employed in this investigation[.]" 5/8/02 Affidavit at ¶ 67. Agent Grunder also detailed instances of physical surveillance in the investigation prior to March 27, 2002. 5/8/02 Affidavit at ¶¶ 31–59. In addition, Agent Grunder described the limited utility of physical surveillance.[11] At the hearing, Agent Grunder testified that

between February 24, 2002 and May 8, 2002, the Task Force, "did some physical surveillance, but it was more the spot check nature than actually following around. Drive by his [Mr. Pappas's] tattoo parlor and see who was there, in his home, see who was there, see where he was going, that sort of thing." Tr. at p. 28.

While Agent Grunder's affidavit may not describe all instances of physical surveillance between March 27, 2002 and May 8, 2002, the omission of this information was not critical to the probable cause determination. The instances of physical surveillance during this time frame were not necessary to the finding of probable cause. In addition, the inclusion of these instances would not have precluded the issuing judge's finding that the Government satisfied the necessity requirement.

### d. Physical review of the Meriden Police Department's file on Virella's arrest for being involved in a "shoot-out."

Pappas also asserts that Agent Grunder's failure to disclose to Chief Judge Covello that he did not physically review the Meriden Police Department's file on Virella's arrest in connection with a shooting at the Residence Inn in Meriden in January 2000 constitutes a material omission.

■■■ Agent Grunder did inform Chief Judge Covello of the Task Force's investigation of the "shoot-out" and its connection to Virella's drug trafficking.[12] Agent Grunder testified that the Task Force did not physically review the Meriden Police Department's case file "[b]ecause I believe

---

**10.** *See infra* pp. 256–57; 5/8/02 Affidavit at ¶¶ 13, 26–29, 76.

**11.** *See infra* pp. 257–58; 5/8/02 Affidavit at ¶¶ 68, 70–71.

**12.** *See infra* at p. 260–61; 5/8/02 Affidavit at ¶¶ 19–21.

Sammy [Virella] was arrested for—in connection with that shoot-out because his fingerprints were found on one of the magazines and was actually tried, I think, in a federal court by the ATF and was acquitted." Tr. at pp. 17–18. Agent Grunder also testified that he did not disclose in the 5/8/02 affidavit that there was no review of that file. Tr. at p. 18.

In his affidavit, Agent Grunder omitted the fact that the Task Force did not physically review the Meriden Police Department file concerning Virella's arrest. However, the omission of this information was not critical to the probable cause determination in light of the contacts with the Meriden Police Department that were disclosed. In addition, the inclusion of the fact that the Task Force did not review this file would not have precluded the issuing judge's finding that the Government satisfied the necessity requirement since the affidavit set forth the Task Force's investigation into this matter and summarized the significant information the Task Force had received concerning the shoot-out, its relation to Virella's drug trafficking activities, and his drug trafficking background.

## III. Conclusion

For the preceding reasons, the defendant's Motion to Suppress Evidence [Doc. # 213] is DENIED.