**UNITED STATES of America,**

v.

**John TOMERO, et al., Defendants.**

**No. S2 06 Crim. 0008(LAK).**

United States District Court,
S.D. New York.

Nov. 27, 2006.

Jonathan Kolodner, Eric Snyder, Assistant United States Attorneys, Michael J. Garcia, United States Attorney, Richard A. Rehbock, for Defendant Ardito.

Vincent J. Martinelli, for Defendant Larca.

Michael Rosen, Jean Graziano, for Defendant Fiorino.

James B. Lebow, for Defendant Russo.

Diarmuid White, for Defendant Tranquillo.

Michael A. Marinaccio, for Defendant De Luca.

Michael J. Gilbert, for Defendant Facciano.

Louis Aidala, for Defendant Galiano.

Nick Pinto, for Defendant Caponigro.

Vincent L. Bricetti, Bricetti Calhoun & Lawrence, LLP, for Defendant Faella.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Thirty-four defendants are charged with various criminal acts associated with the operations of the Genovese organized crime family. Ten move to suppress conversations intercepted by listening devices, colloquially known as "roving bugs," installed in cellular telephones.

### Background

*A. The Investigation*

*1. The Traditional Intercepts*

The indictment stems from a three-year investigation into the criminal activity of members and associates of the Genovese organized crime family. The investigation initially focused on the crew of John Ardi-

to, a high-ranking member of the family. The FBI learned from cooperating witnesses that Ardito's crew met regularly at a restaurant called Brunello Trattoria in New Rochelle, New York, to conduct family business. In December 2002, the Honorable Barbara S. Jones of this Court authorized the interception of oral communications of Ardito and other subjects at this location.

The intercepted conversations revealed that Ardito and his crew met at three additional restaurants, in part because they were suspicious of law enforcement surveillance. The government applied for, and Judge Jones authorized, the interception of conversations at these three restaurants as well as continued interception at Brunello Trattoria. In July 2003, however, Ardito's crew found the listening devices in three of the restaurants and became even more wary of surveillance whenever they returned to their usual meeting places.

### 2. The Roving Intercepts

#### a. Ardito's Cellular Telephone

Based on physical surveillance and the conversations previously intercepted, the FBI learned that Ardito's crew no longer conducted meetings exclusively at the four restaurants, but met also in twelve additional restaurants, automobiles, Ardito's home, an auto store, an insurance office, a jewelry store, a doctor's office, a boat, and public streets.

The government applied for a "roving bug," that is, the interception of Ardito's conversations at locations that were "not practical" to specify, as authorized by 18 U.S.C. § 2518(11)(a). Judge Jones granted the application, authorizing continued interception at the four restaurants and the installation of a listening device in Ardito's cellular telephone.[1] The device functioned whether the phone was powered on or off, intercepting conversations within its range wherever it happened to be.

#### b. Peluso's Cellular Telephone

By February 2004, the government had learned that Peter Peluso, an attorney and close associate of Ardito, was relaying messages to and from high-ranking family members who were wary of government listening devices and who used Peluso as a messenger to avoid meeting together directly. In a renewal application dated February 6, 2004, the government sought, and Judge Jones in due course granted, authority to install a roving bug in Peluso's cellular telephone.[2] This order was renewed several times throughout 2004, as the government continued to identify locations where Peluso and Ardito discussed family matters and learned that the subjects were growing increasingly cautious of government surveillance.

In January 2005, Peluso agreed to cooperate with the government's investigation. At that point the government removed the listening device in his cellular telephone and Peluso began recording conversations with family members consensually by wearing a microphone. On July 7, 2005, Peluso pleaded guilty, pursuant to a coop-

---

1. The order prohibited interception unless "the agents and officers conducting the interception have reason to believe, through physical surveillance, source information, prior interceptions or conduct, or other facts revealed during the course of the investigation that Ardito and other SUBJECTS or other members and associates of [the family] are engag-ing in conversations regarding the SUBJECT OFFENSES." *E.g.*, Application, Sept. 3, 2003 ¶ 8.

2. Like the one installed in Ardito's phone, the device operated whether or not the phone was in use.

eration agreement with the government, to a four-count information, charging him with, among other things, engaging in a pattern of racketeering activity.

### 3. This Motion

By the conclusion of the investigation, the government had intercepted hundreds of hours of Ardito's and Peluso's conversations with each other and with other defendants, including Claudio Caponigro, Pasquale De Luca, Albert Faella, Albert Facciano, Gerald Fiorino, Walter Galiano, Salvatore Larca, Vincent Russo, and Albert Tranquillo, Jr.

On February 14, 2006, a grand jury returned a 42–count indictment charging 32 defendants with wide-ranging racketeering crimes and other offenses spanning more than a decade. On April 3, 2006, the grand jury returned a 45–count superceding indictment naming two additional defendants. Defendants now seek suppression of the conversations intercepted by the listening devices in the Ardito and Peluso cellular telephones.

### Discussion

Title III of the Omnibus Crime Control and Safe Streets Act ("Title III")[3] sets forth procedures for the interception of oral communications. Sections 2518(1)(b)(ii) and (3)(d) require, respectively, that an application for electronic surveillance include "a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted"[4] and be based on "probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or about to be used, in connection with the commission of" an offense.[5]

In 1986, Congress amended Title III to "update and clarify Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies."[6] One of the amendments was Section 2518(11), which permits "roving" electronic surveillance. It provides that

"The requirements of subsections (1)(b)(ii) and (3)(d) of this section relating to the specification of the facilities from which, or the place where, the communication is to be intercepted do not apply if—

"(a) in the case of an application with respect to the interception of an oral communication—

"(i) the application is by a Federal investigative or law enforcement officer and is approved by the Attorney General, the Deputy Attorney General, the Associate Attorney General, an Assistant Attorney General, or an acting Assistant Attorney General;

"(ii) the application contains a full and complete statement as to why such specification is not practical and identifies the person committing the offense and whose communications are to be intercepted; and

"(iii) the judge finds that such specification is not practical"[7]

Section 2518(12) further provides that an agent implementing a roving intercept under subsection 11 must ascertain the place

---

**3.** 18 U.S.C. § 2510 et seq.

**4.** Id. § 2518(1)(b)(ii).

**5.** Id. § 2518(3)(d).

**6.** S.Rep. No. 541, 99th Cong., 2d Sess. 32, reprinted in 1986 U.S.C.C.A.N. 3555, 3555.

**7.** 18 U.S.C. § 2518(11).

of the communication in advance of interception.[8]

### A. Constitutionality of Section 2518(11)

#### 1. Facial Challenge

Defendants argue that the roving bug provision of Title III is unconstitutional because it fails to comport with the Fourth Amendment's requirement that a warrant "particularly describ[e] the place to be searched."[9] In other words, by allowing the government to intercept communications without identifying the place of interception in advance, the statute authorizes general warrants.

In *United States v. Bianco,*[10] the Second Circuit upheld Section 2518(11) against an identical constitutional challenge.[11] That holding is binding here. The facial challenge therefore is foreclosed.

#### 2. As–Applied Challenge

■ Defendants argue that *Bianco* is distinguishable. The argument, however, is unpersuasive.

#### a. Mobile Interception Devices

Defendants point first to the fact that the order in *Bianco* authorized the placement of listening devices only in buildings whereas the order here authorized placement in mobile telephones. But the argument misses the point.

The essence of the motion to suppress is that the statute unconstitutionally permits interception in the absence of any specification of the place where communications are to be intercepted. In *Bianco,* the Second Circuit rejected precisely this argument. The fact that the unspecified location in *Bianco* happened to be in a building had nothing to do with the holding. Furthermore, while a mobile device makes interception easier and less costly to accomplish than a stationary one, this does not mean that it implicates new or different privacy concerns. It simply dispenses with the need for repeated installations and surreptitious entries into buildings. It does not invade zones of privacy that the government could not reach by more conventional means.

#### b. Particular Conversations

Defendants next seek to distinguish *Bianco* on the ground that the government in that case had a particular meeting in mind when it sought authorization to intercept. Again, the distinction is irrelevant. Nothing in *Bianco* suggests that the constitutionality of the statute and the order hinged on the fact that the government knew that a particular meeting was to take place. The issue was whether it knew the location of the anticipated meeting when it obtained the order. It did not, but the order nevertheless was held constitutional.

#### c. Ten–Day Status Reports

Finally, defendants argue that *Bianco* is distinguishable because the order in that case required status reports every seven days instead of every ten. This difference is immaterial. A progress report every ten days was sufficient to keep the issuing court apprised of the status of the investigation and to alert it to any potential government overreaching. Like the issuing judge in *Bianco,* had Judge Jones suspected any government misconduct, she could have revoked or revised the order at

---

**8.** *See id.* § 2518(12).

**9.** U.S. Const. amend. IV.

**10.** 998 F.2d 1112 (2d Cir.1993).

**11.** *Id.* at 1124.

any time.[12]

### B. Section 2518 Requirements

#### 1. Other Investigative Procedures

■ An application for electronic surveillance must include, among other things, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."[13] Defendants argue that the application failed adequately to do so.

As this Court has held, Section 2518(3)(c)'s exhaustion requirement "is far from an insurmountable hurdle. The government must demonstrate only that normal investigative techniques would prove difficult."[14] All that is required is "a reasoned explanation, grounded in the facts of the case, and which squares with common sense."[15] Moreover, as with the issuing judge's determination of probable cause, "a determination that the government has made this showing is entitled to substantial deference from a reviewing court."[16]

Defendants contend that there was no " 'genuine need' for either the Peluso or the Ardito roving bug."[17] They suggest that the government could have relied on its confidential informants, preexisting warrants, or an undercover agent in order to obtain the information it sought.

The government addressed these possibilities in its applications. First, it stated that its confidential informants were unhelpful to the investigation because they were not privy to relevant conversations, in part because the defendants changed meeting locations frequently. In addition, one such informant was unwilling to wear a microphone or testify in court.[18]

Second, the government explained that physical surveillance had been useful in "placing people with each other" and observing that meetings took place, but that it "provide[d] limited evidence of the purpose of the meetings or the content of [the subjects'] conversations."[19]

Third, the government asserted that an undercover operation was "not feasible due, in part, to the unwillingness of the SUBJECTS to deal extensively with outsiders who are not members or associates of" the family or related organizations.[20]

Finally, the government explained why more traditional methods of surveillance than roving intercepts were insufficient. It stated that wiretaps on the Ardito and Peluso cellular telephones were not successful because the subjects "were extremely careful and guarded on the cellphone, [and] recognize[d] the potential for

---

**12.** See Bianco, 998 F.2d at 1125.

**13.** Id. § 2518(1)(c).

**14.** United States v. Bellomo, 954 F.Supp. 630, 638–39 (S.D.N.Y.1997); see also United States v. Torres, 901 F.2d 205, 231 (2d Cir.1990) ("the purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather, they only require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.").

**15.** Bellomo, 954 F.Supp. at 639 (quoting United States v. Ianniello, 621 F.Supp. 1455, 1465 (S.D.N.Y.1985)).

**16.** Id. (citing Ianniello, 621 F.Supp. at 1465).

**17.** Fiorino Br. 14 (quoting Dalia v. United States, 441 U.S. 238, 250, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979)).

**18.** See, e.g., Application, Sept. 3, 2003 ¶ 66(a).

**19.** Id. ¶ 66(b).

**20.** Id. ¶ 66(e).

electronic interception."[21] Further, the conversations intercepted at the four restaurants painted a limited picture of the subjects' criminal activity because defendants were aware of the listening devices there and held meetings in other places, such as public streets, where the risk of surveillance was low.[22]

The applications made a sufficient case for electronic surveillance. They indicated that alternative methods of investigation either had failed or were unlikely to produce results, in part because the subjects deliberately avoided government surveillance.

### 2. Identification of Interceptees

■ Defendants argue also that the order is invalid because the government failed to identify "the person ... whose communications are to be intercepted."[23] They point to the fact that the government's applications named specific subjects, but referred also to "others as yet unknown."

The statute limits interception to situations where "a particular identified individual or individuals can be expected to use numerous telephones or locations to dis-

cuss their crimes as a means of evading surveillance."[24] It does not require the government to name every person whose voice it will capture, however. Rather, use of the singular "person" indicates that the government must identify a main subject whose communications it will intercept. It then may intercept conversations between the subject and interlocutors whose identities may not be known.[25] In other words, the statute prevents the interception of communications between two unknowns, not between a known subject and an unknown interlocutor.[26]

### 3. Impracticality

■ Finally, defendants argue that it was practical to specify the locations of interceptions because Peluso had a propensity to frequent certain locations, and he and Ardito were not entirely successful in evading surveillance.

Title III does not require the government to show complete unpredictability in the movement of the subjects, that other methods of surveillance have failed or would fail, or that the subjects were successful in avoiding interception.[27] It was

21. *Id.* ¶ 66(g).

22. *Id.* ¶ 66(h). The defendants are incorrect to claim that the intercept order was unlawful merely because other investigative techniques had been helpful to the investigation. The government did not seek information it already had obtained through other means. Rather, it sought to "intercept conversations thought necessary to explore matters that the government had not succeeded in investigating through available means." *United States v. Scala*, 388 F.Supp.2d 396, 404 (S.D.N.Y. 2005).

23. 18 U.S.C. § 2518(11)(a)(ii).

24. *United States v. Ferrara*, 771 F.Supp. 1266, 1318 (D.Mass.1991) (noting that § 2518(11)(a)(ii)'s requirement is more stringent than that of § 2518(1)(b)(iv), which requires identification of subjects, "if known").

25. *Id.* ("It is, however, permissible for the government to use a roving intercept order to capture criminal conversation between an anticipated participant who has been targeted by name in a roving order and another individual, whether or not the other person was previously known to the government.").

26. *Id.*

27. Defendants point to the language of § 2518(11)(b), which outlines procedures for roving wiretaps. That section is similar to § 2518(11)(a), but instead of requiring impracticality, requires a showing that the subject's "actions could have the effect of thwarting interception from a specified facility." 18 U.S.C. § 2518(11)(b)(ii). Defendants claim that this additional requirement indicates a lower standard for obtaining a wiretap than an oral intercept. The standard, however, is

required to show only that the defendants moved often enough that the regular procedures for obtaining a warrant would inhibit the interception of some conversations needed for the investigation.[28]

The government satisfied this burden. It determined that Ardito and Peluso met at dozens of locations and frequently were on the move because of their concern about surveillance. It stated in its application for the roving intercept that the subjects "conduct their meetings . . . in cars, at several different restaurants, on the street during 'walks and talks' . . . and in offices." [29] Moreover, the government was conducting a wide-ranging investigation into a sprawling set of alleged conspiracies spanning more than a decade. Conversa-

tions relevant to the case potentially occurred numerous times daily. It would have been impractical for the government to predict their time and location in advance.[30]

### C. Good Faith .

Finally, even if the order failed to comply with Title III's requirements, nothing in the record suggests that the government implemented it in bad faith.

In *United States v. Leon*,[31] the Supreme Court held that suppression is not proper where the government conducted a search in good faith reliance on a facially valid warrant.[32] This good-faith exception to the exclusionary rule applies in Title III cases.[33]

---

not necessarily higher or lower; it simply is more specific. A roving wiretap may be obtained only on a showing of an attempt to thwart surveillance. A roving oral intercept, on the other hand, may be obtained on any showing of impracticality, which *may* include the subject's efforts to evade. Indeed, as the Second Circuit noted in *Bianco*, effort to evade is probative of impracticality. *See Bianco*, 998 F.2d at 1123 (quoting S.REP. No. 54, 99th Cong., 2d Sess. 32, *reprinted in* 1986 U.S.C.C.A.N. 3555, 3586).

**28.** Defendants claim that the government "jump[ed] from interception order to interception order without meaningful and continual reassessment of necessity." Fiorino Br. 15. The Title III applications in this case, however, reveal the opposite. The government began with a traditional intercept order for Brunello Trattoria. When this proved insufficient, it sought to install listening devices in three additional restaurants. Only when this failed did it apply for the roving intercept order on Ardito and eventually Peluso. The government expanded the investigation slowly and deliberately, each time determining that its preexisting warrants were insufficient for intercepting all of Ardito's and Peluso's relevant conversations.

**29.** *See, e.g.*, Application, Sept. 3, 2003 ¶ 66(h).

**30.** Defendants argue also that the order failed to comply with § 2518(12), which provides

that no interception by a roving intercept may begin "until the place where the communication is to be intercepted is ascertained by the person implementing the interception order." 18 U.S.C. § 2518(12). Defendants contend that this section was violated because the "[o]rders are [sic] boilerplate. It includes no such finding [of advance ascertainment]. It simply authorizes interceptions at locations 'that are impractical to specify.' " Fiorino Br. 12.

> This argument is mistaken. Section 2518(12) does not require the order to specify a location in advance, but requires the officer implementing the order to do so. Defendants do not argue, and the record does not indicate, that the officers implementing the order violated this provision.

**31.** 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

**32.** *Id.* at 922 ("We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion.").

**33.** *See, e.g., Bellomo*, 954 F.Supp. at 638 (citing cases where courts applied the good-faith exception to Title III cases). *See also Scala*, 388 F.Supp.2d at 403.

*Conclusion*

Defendants' motions to suppress conversations intercepted pursuant to 18 U.S.C. § 2518 are denied.[34]

SO ORDERED.

---

**34.** Defendants assert in their brief, without explanation, that the government violated Judge Jones's intercept order and misled her about the extent of the surveillance. Fiorino Br. 2 They do not address these contentions, however, let alone provide support for them in the remainder of their brief. Nor does the record indicate that these assertions are true. Accordingly, the claims are disregarded.